No. 2013-1271

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LIFESCAN SCOTLAND LTD. AND LIFESCAN, INC.,

Plaintiffs-Appellees,

v.

SHASTA TECHNOLOGIES, LLC, and
CONDUCTIVE TECHNOLOGIES, INC.,

Defendants-Appellants,

and

INSTACARE CORP. AND
PHARMATECH SOLUTIONS, INC.,

Defendants-Appellants.

_____

Appeal from the United States District Court for the Northern
District of California, Case No. 11-CV-04494, Hon. Edward J. Davila

_____

### BRIEF OF APPELLANTS [NONCONFIDENTIAL]

William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

John J. Shaeffer
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone:  (310) 789-4600
Facsimile:  (310) 789-4601

Robert P. Andris
Lael D. Andara
ROPERS, MAJESKI, KOHN &
BENTLEY
1001 Marshall Street, Suite 500
Redwood City, CA 94063-2052
Telephone    (650) 364-8200
Facsimile    (650) 780-1701

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4 counsel of record for Defendants-Appellants certify as follows:

1) The full name of every party represented by us is Shasta Technologies, LLC, Instacare Corp., Pharmatech Solutions, Inc. and Conductive Technologies, Inc.

2) The names of the real parties in interest represented by us are:  Not applicable

3) All parent corporations and any publicly held companies that own 10% or more of the stock of the parties represented by us:  None.

4) The following law firm and partners and associates are expected to appear in this court:

LATHROP & GAGE LLP                 ROPERS, MAJESKI, KOHN & BENTLEY
William A. Rudy                             Robert P Andris
John Shaeffer                               Lael D. Andara
Carole E. Handler

DATED:  April 12, 2013            Respectfully Submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000

*Counsel for Defendants and Appellants*
*INSTACARE CORP., and*
*PHARMATECH SOLUTIONS, INC.*

Robert P. Andris and Lael D. Andara
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street, Suite 500
Redwood City, CA 94063-2052

*Counsel for Defendants and Appellants*
*SHASTA TECHNOLOGIES, LLC, and*
*CONDUCTIVE TECHNOLOGIES, INC.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE............................................................2

STATEMENT OF FACTS .................................................................3

I.    THE '105 PATENT ...................................................................3

II.   THE FILE HISTORY ...............................................................6

III.  LIFESCAN..............................................................................7

IV.   THE GENSTRIP......................................................................9

V.    THE DISTRICT COURT PRELIMINARY JUNCTION DECISION ......10

      A.  Patent Exhaustion..........................................................10

      B.  Infringement..................................................................11

      C.  Invalidity ......................................................................12

      D.  Irreparable Harm ..........................................................13

SUMMARY OF ARGUMENT ..........................................................14

STANDARD OF REVIEW ...............................................................16

ARGUMENT ................................................................................17

I.    PATENT EXHAUSTION..........................................................17

      A.  Like any Other Form of Property, a Patentee Exhausts Its Patent Rights in an Article by Voluntarily Relinquishing Ownership of the Article .18

      B.  A Feature Abandoned During Prosecution Cannot Be An Inventive Feature of a Patent Sufficient to Defeat Exhaustion. ...........................29

      C.  The Package Notice that the Permitted Use of a OneTouch Ultra Meter is Limited to OneTouch Ultra Strips does not Prevent Patent Exhaustion ...................................................................35

          1.  There is No Contractual Relationship Between Lifescan and Patients Using OneTouch Ultra Meters........................................36

          2.  Lifescan's Purported Contractual Limitation on Use is Anti-Competitive and Unenforceable .................................................39

II.   INFRINGEMENT....................................................................41

III.  INVALIDITY .........................................................................46

A.  Prior USPTO Citation of References does not Lead to the District Court's Conclusion ............................................................... 47

B.  Appellants Presented Articulated Reasoning with Rational Underpinnings to Support the Legal Conclusion of Obviousness ....... 48

C.  Appellants' Proposed Obviousness Rejections meet all Claim Limitations ............................................................................... 50

D.  Secondary Considerations do not Overcome Appellants' Obviousness Challenge ............................................................ 53

IV.  THE DISTRICT COURT ERRED IN CONCLUDING THAT THIS COURT'S "CAUSAL NEXUS" REQUIREMENT FOR IRREPARABLE HARM DID NOT APPLY TO THIS CASE ............................................. 54

CONCLUSION ................................................................................. 57

ADDENDUM ................................................................................... 60

CONFIDENTIAL MATERIALS OMITTED: The material omitted on pages 8-9 and 29 describes confidential pricing information.  The material omitted on page 40 describes confidential information relating to manufacturing costs and pricing.

# TABLE OF AUTHORITIES

**Cases**

*Acco Brands, Inc. v. PC Guardian Anti-Theft Product*,
  2008 WL 3915322 (N.D. Cal. 2008) ...................................................30

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012)...........................................................49

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001)...........................................................46

*American Tobacco Co. v. Werckmeister*,
  207 U.S. 284 (1907) ...........................................................................27

*Apple Inc. v. Samsung Electronics Co.*,
  678 F.3d 1314 (Fed. Cir. 2012)...........................................................16

*Apple Inc. v. Samsung Electronics Co.*,
  695 F.3d 1314 (Fed. Cir. 2012).............................. 2, 13, 14, 16, 54, 56

*Bauer & Cie v. O'Donnell*,
  229 U.S. 1 (1913) ......................................................................... 18, 28

*Beaumont v. Beaumont*,
  152 F. 55 (3d Cir. 1907).....................................................................20

*Bloomer v. Millinger*,
  68 U.S. 340 (1864)..............................................................................19

*Bobb-Merrill Co. v. Straus*,
  210 U.S. 339 (1909).............................................................................28

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989).............................................................................34

*Boston Store of Chicago v. American Graphophone Co.*,
  246 U.S. 8 (1918)................................................................................28

*Bromley v. McCaughn*,
    280 U.S. 124 (1929)......................................................................................20

*Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*,
    72 F.3d 872 (1995).......................................................................................17

*Chaffee v. Boston Belting Co.*,
    63 U.S. 217 (1859)........................................................................................21

*Consolidated Fruit-Jar Co. v. Wright*,
    94 U.S. 92 (1876).........................................................................................32

*District of Columbia v. Brady*,
    288 F.2d 108 (D.C. Cir. 1960).....................................................................20

*Erico Int'l Corp. v. Vutec Corp.*,
    516 F.3d 1350 (Fed. Cir. 2008)....................................................................46

*ExcelStor Technology v. Papst Licensing GMBH & Co.*,
    541 F.3d 1373 (Fed. Cir. 2008)....................................................................17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ............................................................................. 16, 17

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010)......................................................................45

*Harper& Row Pubs., Inv. v. Nation Enters.*,
    471 U.S. 539 (1985)......................................................................................27

*Haynes Intern., Inc. v. Jessop Steel Co.*,
    8 F.3d 1573 (Fed. Cir. 1993)........................................................................33

*Hewlett-Packard v. Repeat-O-Type Stencil Mfg. Corp., Inc.*,
    123 F.3d 1445 (Fed. Cir. 1997)....................................................................36

*Hostetler v. City of Perrysburg*,
    998 F.Supp. 820  (N.D. Ohio 1998)..............................................................21

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006)........................................................................................40

*In re Kahn,*
   441 F.3d 977 (Fed. Cir. 2006)..................................................................50

*In re Paper-Bag Cases,*
   105 U.S. 766 (1882) .............................................................................21

*In re Yamamoto,*
   740 F.2d 1569 (Fed. Cir. 1984)..............................................................32

*Intel Corp. v. ULSI Sys. Tech., Inc.,*
   995 F.2d 1566 (Fed. Cir.1993)...............................................................20

*International Rectifier Corp. v. IXYS Corp.,*
   361 F.3d 1363 (Fed. Cir. 2004)..............................................................45

*Int'l Visual Corp. v. Crown Metal Co.,*
   991 F.2d 768 (Fed. Cir. 1993)................................................................44

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.,*
   309 F.3d 1365 (Fed. Cir. 2002)..............................................................43

*Jazz Photo Corp. v. International Trade Com'n.,*
   264 F.3d 1094 (2001) ..................................................................... 22, 36

*Keeler v. Standard Folding Bed Co.,*
   157 U.S. 659 (1895) .............................................................................19

*Kendall v. Winsor,*
   62 U.S. 322 (1959) ...............................................................................23

*KSR Intern. Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) ....................................................................... 50, 52

*LG Electronics, Inc. v. Bizcom Electronics, Inc.,*
   453 F.3d 1364 (Fed.Cir. 2006)...............................................................23

*LG Electronics, Inc. v. Hitachi Ltd.,*
   655 F.Supp.2d 1036 (N.D. Cal. 2009) ............................................. 30, 34

*Litton Systems, Inc. v. Whirlpool Corp.*,
  728 F.2d 1423 (Fed. Cir. 1984) ............................................................ 33

*Mallinkrodt, Inc. v. Medipart, Inc.*
  976 F.2d 700 (Fed. Cir. 1992) .................................................. 36, 38, 39

*Mark I Marketing Corp. v. Donnelley & Sons Co.*,
  66 F.3d 285 (Fed.Cir 1995) .................................................................... 35

*McCoy v. Mitsuboshi Cutlery, Inc.*,
  67 F.3d 917 (Fed. Cir 1995) .................................................................. 24

*McCreary Cnty. v. Am. Civil Liberties Union of Ky.*,
  545 U.S. 844 (2005) ............................................................................... 17

*Mercoid Corp. v. Mid-Continent Investment Co.*,
  320 U.S. 661 (1944) ......................................................................... 23, 26

*Microsoft Corp. v. i4i Ltd. P'ship*,
  __ U.S. __, 131 S. Ct. 2238 (2011) ...................................................... 48

*Mitchell v. Hawley*,
  83 U.S. 544 (1873) ................................................................................ 19

*Moore v. James H. Matthews & Co.*,
  550 F.2d 1207 (9th Cir. 1977) ........................................................ 40, 41

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*,
  152 U.S. 425 (1894) ......................................................................... 21, 22

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) ............................................................ 53

*OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*,
  701 F.3d 698 (Fed. Cir. 2012) ........................................................ 46, 47

*Pregis Corp. v. Kappos*,
  700 F.3d 1348 (Fed. Cir. 2012) ............................................................ 53

*Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998) .............................................................................. 28

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
  553 U.S. 617 (2008) .................................................................. passim

*Rick-Mik Enterprises v. Equilon Enterprises*,
  532 F.3d 963 (9th Cir. 2008) ............................................................39

*Rosenbrough Monument Co. v. Memorial Park Cemetery*,
  666 F.2d 1130 (8th Cir. 1981) ...........................................................41

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
  311 U.S. 211 (1940)........................................................................34

*Sciele Pharma Inc. v. Lupin Ltd.*,
  684 F.3d 1253 (Fed. Cir. 2012).........................................................48

*Sears, Roebuck & Co. v. Stiffel Co.*,
  376 U. S. 225 (1964).......................................................................34

*Softman Products Co., LLC v. Adobe Systems, Inc.*,
  171 F.Supp.2d 1075 (C.D. Cal. 2001) ...............................................37

*Static Control Components v. Lexmark, Inter., Inc.*,
  615 F.Supp.2d 575 (E.D.Ky 2009) ............................................. 24, 38

*Tessera, Inc. v. International Trade Com'n*,
  646 F.3d 1357 (Fed. Cir. 2011)........................................... 20, 25, 26

*TransCore v. Electronic Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009)................................................. 23, 35

*Trustees of Dartmouth College v. Woodward*,
  17 U.S. 518 (1819).................................................................. 20, 21

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 563 (1992).......................................................................33

*U.S. v. Madoff*,
  826 F.Supp.2d 699 (S.D.N.Y. 2011) .................................................21

*UMG Recordings, Inc. v. Augusto*,
   628 F.3d 1175 (9th Cir. 2011) .................................................. 27, 37

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942) .................................................. 22, 26

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) ..................................................27

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942) .................................................. 20, 22

*Vernor v. Autodesk, Inc.*,
   621 F.3d 1102 (9th Cir.2010) ..................................................38

*Wang Laboratories, Inc. v. America Online, Inc.*,
   197 F.3d 1377 (Fed. Cir. 1999)..................................................44

*Wang Laboratories, Inc. v. Mitsubishi Electronics America*,
   103 F.3d 1571 (Fed. Cir. 1997)..................................................35

*Wilder v. Kent*,
   15 F. 217 (C.C.WD. Pa. 1883)..................................................24

*Wyers v. Master Lock Co.*,
   616 F.3d 1231 (Fed. Cir. 2010)..................................................53

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
   465 F.3d 1312 (Fed. Cir. 2006)..................................................33

## Statutes & Other Authorities

35 U.S.C. § 102. .................................................. 31, 33

35 U.S.C. § 103 .................................................. 32, 44, 47, 49, 50

35 U.S.C. § 261 ..................................................18

37 C.F.R. § 1.135 ..................................................33

Chiapetta, *Patent Exhaustion: What is it Good For?*,
   51 Santa Clara L. Rev. 1087 (2011) ..................................................37

Piascik, *Gifts and Corporate Influence in Doctor of Pharmacy Education*,
    71 Am.J of Pharmaceutical Education (4) Art. 68 (2007)....................................25

Rinehart, *Contracting Patents: A Modern Patent Exhaustion Doctrine*,
    23 Harv. J. of Law & Tech 486 (2010)...............................................................37

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Federal Circuit Rules of Appellate Procedure, there are no other appeals in or from this civil action that were previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

This appeal is from the grant of a preliminary injunction in a patent case made pursuant to the written order of the Honorable Edward J. Davila issued on March 19, 2013. [A-30] The Notice of Appeal was timely filed the next day on March 20, 2013. [A-2149] This Court has jurisdiction over this interlocutory order in this case seeking a declaration of patent infringement pursuant to 28 U.S.C. §§ 1292(c)(1) and 1295(a)(1).

## STATEMENT OF ISSUES

1) Does a patentee exhaust its patent rights in an article by voluntarily relinquishing ownership in the article?

2) Can features abandoned during prosecution be revived as an "inventive feature" sufficient to defeat patent exhaustion?

3) Did the District Court improperly construe "proportion(al)," resulting in an erroneous conclusion regarding infringement?

4) Did the District Court incorrectly analyze invalidity for obviousness under 35 U.S.C. § 103, such that a substantial question of invalidity exists and the preliminary injunction was granted in error?

5) Does the "causal nexus" requirement necessary to prove irreparable harm – as discussed in *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370 (Fed. Cir. 2012) – apply to inventions less sophisticated than a feature rich smart phone?

## STATEMENT OF THE CASE

On March 19, 2013, the District Court granted a preliminary injunction in favor of Plaintiffs and Appellees Lifescan Inc. and Lifescan Scotland Ltd. (collectively, "Lifescan") enjoining the sale of the GenStrip.[1]  [A-29:24-27]  The GenStrip is a disposable glucose monitoring test strip compatible with certain portable glucose monitoring meters sold under the brand name OneTouch Ultra by Lifescan.  [A-2:4-6; 3:6-7]  Appellants Shasta Technologies, LLC ("Shasta"), Instacare Corp. ("Instacare"),  Pharmatech Solutions, Inc. ("Pharmatech") and Conductive Technologies, Inc. ("Conductive") (collectively, "Appellants") make and sell the GenStrip.  [A-1:15-19]  The District Court concluded that: (a) Lifescan would likely succeed on its claim that, by making and selling the GenStrip, Appellants induce and contribute to diabetic patients' infringement of U.S. Patent No. 7,250,105 ("'105 patent") when patients use a GenStrip with a OneTouch Meter; and (b) there is no substantial question regarding validity of the '105 patent.  [A-25:12-21]

---

[1] A copy of this Order is attached to this brief as an Addendum for the Court's convenience.

Eighteen months earlier, Lifescan filed an initial complaint against Appellants seeking a declaration of infringement with respect to two other patents. Lifescan filed its complaint after learning of Appellants' non-public 510(k) application to the Food and Drug Administration ("FDA") for clearance to market and sell the GenStrip to work with the OneTouch Ultra meter. [A-35]

On December 14, 2012, shortly after amending its complaint to add the '105 patent, Lifescan filed a motion for preliminary injunction citing the '105 patent only. [A-55]

On February 21, 2013, the District Court heard three hours of oral argument on Lifescan's motion for preliminary injunction. [A-2041]

On March 19, 2013, the District Court granted Lifescan's motion for a preliminary injunction. On March 20, 2013, Appellants filed the instant appeal.

## STATEMENT OF FACTS

### I.    THE '105 PATENT

The relevant technology is glucose monitoring systems. The state of the art as of the priority date of the '105 patent favored electrochemical measurement methods like those used by the OneTouch Ultra system. [A-945 at 1:25-26] "The general principle is that an electric current is measured between two sensor parts called the working and reference sensor parts respectively." [A-945 at 1:27-29]. A reagent is deposited on the working sensor that, when contacted with a blood sample, causes electrons from blood glucose to release and a mediator to transfer

the electrons to the surface of the working sensor.  [A-945 at 1:29-33]  Underlying

this is the fact that "the current generated is proportional to . . . the concentration of

the glucose in the test sample."  [A-945 at 1:33-38; A-933 at 4.2]

   The '105 patent specification notes "that in all practical blood glucose

measuring systems" the part that "comes in contact with the sample blood is

disposable."  [A-945 at 1:19-21]  Sensors are affixed to the disposable test strips.

[A-945 at 1:39-48]  The '105 patent specification described a perceived problem in

the art to be inaccurate readings caused by insufficient blood coverage of the

working sensor or by manufacturing defects.  [A-11:17-19]  The '105 patent

specification further acknowledged that affixing two or more working sensors to a

disposable test strip was known in the art at the time.  [A-945 at 1:39-48]

   The '105 patent contains a single independent method claim.  [A-947 at

6:51-8:5]  The "inventive feature" of the claim, and the reason given by the

examiner for allowable subject matter, is the step of "measuring an electric current

at each working sensor part proportional to the concentration of said substance in

the sample liquid; comparing the electric current from each of the working sensor

parts to establish a difference parameter; and giving an indication of an error if said

difference parameter is greater than a predetermined threshold." [A-1849; A-948

7:12-8:4; A-30:33:4-19; A-69:23-70:1]   In its entirety, claim 1 reads as follows:

   The invention claimed is:

   1. A method of measuring the concentration of a substance
      in a sample liquid comprising the steps of:

providing a measuring device said device comprising:

a first working sensor part for generating charge carriers in proportion to the concentration of said substance in the sample liquid;

a second working sensor part downstream from said first working sensor part also for generating charge carriers in proportion to the concentration of said substance in the sample liquid wherein said first and second working sensor parts are arranged such that, in the absence of an error condition, the quantity of said charge carriers generated by said first working sensors part are substantially identical to the quantity of said charge carriers generated by said second working sensor part; and

a reference sensor part upstream from said first and second working sensor parts which reference sensor part is a common reference for both the first and second working sensor parts, said reference sensor part and said first and second working sensor parts being arranged such that the sample liquid is constrained to flow substantially unidirectionally across said reference sensor part and said first and second working sensor parts; wherein said first and second working sensor parts and said reference sensor part are provided on a disposable test strip;

applying the sample liquid to said measuring device; measuring an electric current at each working sensor part proportional to the concentration of said substance in the sample liquid;

comparing the electric current from each of the working sensor parts to establish a difference parameter; and giving an indication of an error if said difference parameter is greater than a predetermined threshold.

[A-947 at 6:52-8:13]

The two dependent claims provide (1) measuring the current after a

predetermined time; and (2) that the substance being measured is glucose.  [A-948 at 8:6-12]

## II.    THE FILE HISTORY

The '105 patent is a continuation of application 09/521,163, filed March 8, 2000, which later issued as U.S. Patent No. 6,733,655 ("'655 patent").  [A-942] Like the '105 patent, the '655 patent includes a single independent method claim.  [A-980 6:7-11-8:13]  In the applications that matured into both the '655 patent and the '105 patent, the same examiner rejected apparatus claims, including apparatus claims for the relevant test strip.  [A-1027-43, A-2064:8-15, A-2083:8-2085:16, 2086:8-21]  The inventors cancelled all apparatus claims so that the method claims in each could issue.  [A2083:15-2084:9]  The '105 patent issued on July 21, 2007.  [A-942]

On July 1, 2007, the inventors filed application number 11/772,714, as a further continuation of the '655 and '105 patents ("'714 application").  [A-1027] On July 2, 2007, the inventors filed a preliminary amendment canceling all claims in the original application and submitted new claims for examination.  All of the new claims were directed only to the disposable test strip necessary to practice the method in the '105 patent.  [A-1055-1061, A-2085]  On October 2, 2009, the same examiner who examined the '665 patent and the '105 patent issued a non-final office action rejecting all claims in the '714 application as either anticipated or

obvious.  [A-985-1004]  When the inventors failed to respond to the office action, the examiner mailed a notice of abandonment.  [A-983]

## III.    LIFESCAN

Since 2000, Lifescan has made, marketed, and sold the OneTouch Ultra systems to the diabetic community, which is keenly interested in glucose monitoring.  [A-2:4-6]  As described, its system has two principle components: (1) an electronic meter for measuring the electric current associated with a disposable test strip; and (2) the disposable test strips themselves.  [A-2:8-9, A-64:18]  To use the system, a patient places a disposable test strip in the meter, draws a small drop of blood using a lancet, and touches the end of the strip to the drawn blood.  [A-2:9-12]  "The meter then determines the glucose level in the blood by measuring the electrical current produced when the electrochemical reaction is triggered in the strip by the glucose."  [A-2:11-13]

Lifescan advertises its OneTouch Ultra systems as having Double Sure Technology.  [A-2:14-15]  OneTouch Ultra systems with Double Sure Technology "take[] two measurements for every blood sample, to protect against errors and to provide enhanced accuracy in blood glucose measurements."  [A-65:10-12] Lifescan contends that OneTouch Ultra systems with Double Sure Technology practice the '105 patent.  [A-2:14-17]

Lifescan is the market leader in glucose monitoring systems, with more than 30% of the domestic market.  It earns about $1 billion in sales annually.  [A-2:7-8]

As a marketing strategy, Lifescan distributes 60% of its meters packaged with sample test strips as OneTouch Ultra starter kit to health care providers to be given to diabetes patients free of charge. Lifescan allegedly sells the remainder of its meters at a discount. [A-5:23-26, A-2008 at ¶¶ 5-6]

The sale of test strips compatible with a unique glucose monitoring meter is the way Lifescan and its competitors make the bulk of their revenues. Lifescan designed its test strip to work exclusively with its OneTouch Ultra meters, and there were no competitive strips that worked with OneTouch Ultra meters until the GenStrip. [A-65:7-9] At the bottom of the packaging for OneTouch Ultra meters Lifescan is a notice that the meter is protected by certain patents, including the '105 patent, and that a license to use the device "is granted only when the device is use with OneTouch Ultra test strips." [A-367]

## IV.    THE GENSTRIP

In December, 2010, Shasta filed with the FDA a 510(k) application supported by research and clinical studies to demonstrate the Genstrip's substantial equivalence to a medical device already in the market place. [A-522:6-12] During the non-public FDA review process, Shasta entered a contract with Conductive for the further development and manufacturing of the Genstrip and with Pharmatech and Instacare for the eventual marketing and distribution of the Genstrip. [A-522:10-12] All FDA proceedings under the 510(k) program are "substantial equivalence" determinations. [A1336 at ¶ 6] For example, the 510(k) issued to Lifescan for its OneTouch Ultra products was based on substantial equivalence to one or more previously approved medical devices. [A-599:18-24]

In December 2012, the FDA issued a finding of substantial equivalence for the Genstrip with certain OneTouch Ultra meters. Specifically, GenStrip has a labeling limitation that it agreed to as part of its 510(k) prosecution with the FDA. Defendants are not allowed to sell their GenStrip test strips to any user of OneTouch Ultra meter if the meter was acquired by the diabetic patient after July 2010. [A-1337 at ¶ 10]

After receiving 510(k) clearance, Appellants began selling and marketing the GenStrip.  [A-3:6-12, A-35:3-10, A-523:9-15]  Neither GenStrip's marketing nor its packaging reference, in any way, whether the GenStrip incorporates the technology described in the '105 patent.  [A-321, A-398-404]

## V.    THE DISTRICT COURT'S PRELIMINARY JUNCTION DECISION

The District Court granted Lifescan's motion for preliminary injunction on the following grounds.  [A-1-30]

### A.    Patent Exhaustion

The District Court concluded that Lifescan would likely prevail that the '105 patent was not exhausted in any respect.

The District Court first addressed Lifescan's free distribution of OneTouch Ultra starter kits, which included both a meter and sample test strips, to health care providers, to in turn be given to their diabetic patients.  The District Court recognized that no court of higher authority had directly addressed "whether it's the transfer of title and ownership or . . . the purchase and sale of a patented article that triggers" exhaustion.  [A-6:11-13]  After reviewing the case law, the District Court noted that "[t]he common theme running through this line of cases is consideration."  [A-9:14]  The District Court then decided that patentees must receive their "reward at the time of distribution," rejecting Appellants' argument that exhaustion had occurred because Lifescan alone decided to reap its reward from patients' subsequent purchase of test strips.  [A-9:25-10:6]  The District

Court then concluded that "because Plaintiffs here do not receive any reward at the time of distribution, Plaintiffs can likely show that patent exhaustion is not triggered by the free distribution of its OneTouch Ultra kits." [A-10:4-6]

The District Court next considered the meters that Lifescan sells at a discount. The District Court did not consider the adequacy of the reward Lifescan received. Instead, the District Court held that the meter alone did not embody all of the "inventive features" of the '105 patent, finding that some such features were necessarily contained in the test strip. [A-14:8-9] In discussing exhaustion, the District Court did not consider the impact of Lifescan's abandonment of its application for a patent on the strip. The District Court did, however, consider the relevance of this abandonment later in its discussion on invalidity and concluded that it did not "find that the USPTO's rejection of the '714 patent application or [Lifescan's] subsequent abandonment of that application generate[d] a substantial question as to the validity of the '105 patent." [A-22:5-18]

Concluding that exhaustion did not apply at this threshold level, the District Court did not consider any other element of patent exhaustion.

## B.    Infringement

The District Court characterized Appellants' infringement defense as "unusual" because Appellants did not "vehemently deny[] infringement on the bases of differences between their product and the patented invention." [A-15:16-18] The District Court concluded that Appellants had "urge[d] the [District C]ourt

11

to find that direct infringement [by users of the OneTouch Ultra meter was] impossible[] because neither Genstrip nor [Lifescan's] strip are capable of practicing the '105 patent as drafted." [A-15:21-23] The Court mischaracterized Appellants' argument as "urging the [District C]ourt to accept that the '105 patent uses science that is 'simply incorrect,' requiring the electric current itself, rather than the measurement of that current through the manipulation of the current data, to be proportional to the amount of glucose in the blood." [A-15:26-16:6] Based on this mischaracterization, the District Court concluded that Appellants' construction of the term "proportional" was "contorted and divorced from the art, and even contrary to [Appellants'] own usage of the term." [A-17:1-2]

## C.    Invalidity

The District Court characterized the thrust of Appellants' invalidity challenges as being "that the '105 patent is obvious because prior art discloses, most importantly, the elements of employing a disposable test strip containing multiple sensors, positioning the sensors in a downstream configuration, taking multiple measurements, comparing the measurements to establish a difference parameter, and presenting an error code if the difference is outside a predetermined range, and because the combination of these elements yields nothing more than a predictable result." [A-22:13-18]

After briefly reviewing Appellants' prior art references, the District Court concluded that, on a whole, Lifescan has "shown a likelihood of overcoming

[Appellants'] obviousness challenges," offering four reasons.  [A-22:20-21]  First, the District Court "note[d] that five of [Appellants'] references were considered by the patent examiner."  [A-22:26-27]  "Second, [Appellants'] combinations of references [were] not compelled because the art was not concerned with the problems . . . addressed in the '105 patent."  [A-23:7-8]  "Third, no combination of references presented by [Appellants] covers each and every limitation of Claims 1 and 3."  [A-23:18-19]  "Finally, both the combinations themselves and secondary considerations suggest that the [Appellants] have improperly used hindsight to construct these obviousness combinations."  [A-24:7-8]  With respect to secondary considerations, the District Court cited the commercial success of the OneTouch Ultra system and that Appellant's "near exact copying of [Lifescan's] test strip."  [A-24:21-22]

### D.    Irreparable Harm

The District Court recognized this Court's recent pronouncement that "irreparable harm is not proven if consumers buy th[e] product for reasons other than the patented feature." [A-27:1-3 (citing *Apple, Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012))].  The District Court was "not persuaded," however, that this Court's decision in *Apple* applied to this case.  [A-27:3]  "Unlike a smartphone, which contains a myriad of features, test strips designed for use with the OneTouch Ultra meter embody a substantial part of the patented feature and not much else." [A-27:4-7]  The District Court concluded that

13

the mere fact that the Genstrip worked with the "market leader" in personal

glucose monitoring, "suggest[ed] that [Lifescan] possesse[d] a superior

technology, the technology of the '105 patent," and, thus, satisfies the causal nexus

requirement of *Apple.*  [A-27:3-7]

## SUMMARY OF ARGUMENT

Consistent with the laws governing personal property in general, patent

exhaustion occurs when the patentee relinquishes ownership in a patented article or

an article practicing a patented method.  While patent law clearly limits a patentee

to a single reward for any given patented article, exhaustion has never been

dependent upon a reward's adequacy or timing or the existence of any reward at

all.  The District Court erred in concluding that Lifescan could sidestep patent

exhaustion by simply giving away OneTouch Ultra systems to patients with the

expectation of reaping rewards in the future from patients' subsequent purchases of

additional OneTouch Ultra Test strips.  To affirm would ask courts to now

absurdly judge for purposes of exhaustion: (1) whether a patentee's own profit

model sufficiently rewards the patentee; and (2) when, during a stream of revenue

received by the patentee from the use of an article, is a reward sufficient to trigger

exhaustion.

Lifescan's voluntary decision to sell the OneTouch Ultra meter at a discount

to diabetic patients – even when not coupled with OneTouch Ultra test strips –

similarly exhausts any '105 patent claim Lifescan might have with respect to the

use of such meter with any disposable test strip.  The District Court correctly noted that a disposable test strip of a certain configuration was an "important component of the '105 patent's invention."  [A-13:8-9]  The District Court, however, erred in ignoring that Lifescan abandoned during prosecution any possible inventive features of such a test strip.  An unpatentable feature can never be an inventive feature that can forestall patent exhaustion.

The District Court similarly erred in rejecting Appellants' noninfringement position based on the lack of "proportion(al)" measuring.  When "proportion(al)" is properly construed, neither Lifescan's OneTouch Ultra meter, nor any other commercially available meter, practices the '105 patent using Appellants' test strip.

Using the current claim construction for "proportion(al)," however, the District Court should have found a substantial question of invalidity under 35 U.S.C. § 103.  Its failure to do so is not justified by the record and is based predominantly on three fundamental missteps: (a) use of secondary considerations without any nexus to the claimed subject matter; (b) improper focus on the patent owner's stated motivation for making the "invention"; and (c) undue deference to the fact that the USPTO considered some of the references presented by Appellants.  The remaining basis for the District Court's conclusion is similarly unsupported.  While the District Court provided two areas of the claims purportedly not met by Appellants' obviousness contentions, the District Court

proceeded to acknowledge that the prior art meets those claim provisions in accordance with Appellants' arguments.

The District Court erred in finding that Lifescan established the requisite causal nexus required for irreparable harm. Lifescan advertises to the diabetic community the method of the '105 patent as its DoubleSure Technology. Nothing on GenStips' packaging or in its advertising or marketing suggest that the GenStrip implements this technology. In fact, Lifescan does not know whether the GenStrips can implement this technology and believes that customers would purchase the GenStrip due to its lower price only. Nothing in the record supports "that the infringing feature drives consumer demand for the accused product," as this Court recently indicated was required to prove requisite causal nexus. *Apple, Inc. v. Samsung Electronics Co*., 695 F.3d 1314, 1374 (Fed.Cir. 2012) (citing *Apple, Inc. v. Samsung Electronics, Co*., 678 F.3d 1314, 1324 (Fed. Cir. 2012)). The District Court erred in holding that Lifescan met any causal nexus burden simply by showing that the GenStrip worked with Lifescan's market leading meter.

## STANDARD OF REVIEW

"On an appeal from the grant of a preliminary injunction, [this Court] review[s] the [D]istrict [C]ourt's legal rulings *de novo* and its ultimate decision to grant a preliminary injunction for abuse of discretion." *Apple Inc. v. Samsung Electronics Co., Ltd*., 695 F.3d at 1373 (*citing Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006); *McCreary Cnty. v. Am. Civil Liberties Union of Ky*., 545 U.S. 844, 867 (2005)).

## ARGUMENT

### I.   PATENT EXHAUSTION

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Specifically, "[t]he exhaustion doctrine prohibits patent holders from selling a patented article and then 'invoking patent law to control post sale use of the article.'" *ExcelStor Technology v. Papst Licensing GMBH & Co*., 541 F.3d 1373, 1376 (Fed. Cir. 2008) (*quoting Quanta*, 553 U.S. at 638).

LifeScan makes no claim for direct infringement of the '105 patent by Appellants.  [A-2106:12-24]  Instead, Lifescan claims that diabetic patients who use the GenStrip with certain OneTouch Ultra meters directly infringe the '105 patent, and, by making and selling the GenStrip, Appellants induce and/or contribute to, such infringement.  [A-15:3-15, A-2106:12-24]  If patent exhaustion extinguishes Lifescan's right to enforce the '105 patent against patients using OneTouch Ultra meters, Lifescan has no viable claim for infringement against Appellants.  *Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872, 879 (1995) (no claim of infringement against maker of replacement parts where owner had the right to use).

In granting Lifescan a preliminary injunction, the District Court held for the first time that, for purposes of exhaustion, no sale occurs when the patentee gives away an article that practices a patented method. The District Court also held for the first time that features abandoned during prosecution could still embody an "inventive feature" that, if not part of the article sold, could defeat exhaustion. Both conclusions constitute legal error.

Even if this Court were to determine that the District Court erred in only one, but not both, of its decisions, reversal is still appropriate. Even a single error means that Lifescan lacks any legal basis to deny a meaningful portion of diabetic patients using OneTouch Ultra meters their right to choose to use the GenStrip. For this reason, any balance of equities strongly tips in favor of patients not being denied the competitive alternative the GenStrip provides.

## A.    Like Any Other Form of Property, a Patentee Exhausts Its Patent Rights in an Article by Voluntarily Relinquishing Ownership of the Article

"The right to make, use and sell an invented article is not derived from the patent law. This right existed before and without the passage of the law and was always the right of an inventor," as it is of any property owner. *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10 (1913) (price fixing subsequent sales); 35 U.S.C. § 261 ("patents shall have the attributes of personal property"). The patent act instead "secure[s] to the inventor the *exclusive* right to make, use and vend the thing

patented, and consequently prevent other from exercising like privileges without consent of the patentee." *Id.*

When a patentee sells an invented item or an item that practices a patented method, such sale "terminates all patent rights to that item." *Quanta*, 553 U.S. at 625; *Bloomer v. Millinger*, 68 U.S. 340, 351 (1864) ("when the patented machine rightfully passes from the patentee to the purchaser, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly."). Similarly, when a patentee licenses another to sell a patented article, the patentee retains no patent rights with respect to any item sold by such an authorized seller. *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) ("one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place.").

By contrast, where a patentee merely licenses another to make and/or use a patented article only, a transfer by such licensee would not terminate the patentee's rights because the transfer was not an authorized sale. *Mitchell v. Hawley*, 83 U.S. 544, 551 (1873) (granting a license to use did not give the right to resell). Numerous opinions turn on whether a patentee's grant of a licensee included the right to sell, rendering such sales "authorized sales" for patent exhaustion

purposes.[3] *Tessera, Inc. v. International Trade Com'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011) ("The proper focus is on whether the sales were authorized."); *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent.").

Ownership of property has always carried with it the right to give that property away. *Bromley v. McCaughn*, 280 U.S. 124, 140 (1929) ("The right to give away one's property is as fundamental as the right to sell it or, indeed, to possess it."). Similarly, "[i]t is a general rule that anyone who freely, willingly, and knowingly (*i.e.*, voluntarily) gives something to another loses all title to it." *District of Columbia v. Brady*, 288 F.2d 108, 111 (D.C. Cir. 1960); *Beaumont v. Beaumont,* 152 F. 55, 59 (3d Cir. 1907) ("Where delivery of the property has once been made and possession transferred, the gift is irrevocable, and is not affected by the fact that the donor immediately thereafter comes into the physical possession and control of the property, without any retransfer of the ownership by the donee"). "The property conveyed…becomes, as against the donor, the absolute property of the donee; and no subsequent change of intention of the donor can change the rights of the donee." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518,

---

[3] *Quanta*, 553 U.S. at 636 ("LGE argues that there was no authorized sale here because the License Agreement does not permit Intel to sell its products for use in combination with non-Intel products to practice the LGE Patents."); *United States v. Univis Lens Co.,* 316 US 241, 247 (1942) (license to resell at a particular retail price).

683 (1819); *U.S. v. Madoff*, 826 F.Supp.2d 699, 704 (S.D.N.Y. 2011) ("under the law, a gift is not revocable merely because the premise for the gift was false"); *Hostetler v. City of Perrysburg*, 998 F.Supp. 820, 823 (N.D. Ohio 1998) ("Once a donor gives an unrestricted gift, he cannot demand repayment, even though the donee disregards his desires.").

The very same principles governing the rights of one who lawfully comes into possession of property carries into patent law. *Morgan Envelope Co. v. Albany Perforated Wrapping Paper* Co., 152 U.S. 425, 432 (1984) ("having the absolute ownership of the machine, he had the right either to use it during the existence of the letters patent, or to transfer such ownership and right to another.") For "it is obvious, if a person legally acquires a title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it, as he pleases, in the same manner as if dealing with property of any other kind." *Chaffee v. Boston Belting Co.*, 63 U.S. 217, 223 (1859); *In re Paper-Bag Cases*, 105 U.S. 766, 771 (1882) ("Power to sell the machine and transfer the accompanying right of use is an incident of unrestricted ownership.").

The District Court below recognized the tension between the basic personal property treatment of a patented article and the exclusive right granted patentees under the patent act. Specifically, the District Court identified "[t]he question presented the by parties – whether it is the transfer of title and ownership rather

than the purchase and sale of the patented article that triggers the first sale doctrine – has not been directly addressed by courts of higher authority." [A-6:11-13]

As is self-evident from this question, the patent laws afford patentees no right to profit from, or control, any subsequent disposition of a patented article because "'the purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article.'" [A-5:4-6 (*quoting United States v. Univis Lens Co.*, 316 U.S. at 251)] Rather than requiring any consideration to trigger exhaustion, however, cases citing the patentee's reward highlight that the patentee gets only one bite at the apple.[4] For example, in *United States v. Masonite Corp.,* 316 U.S. 265 (1942), the Supreme Court struck down an "agency" agreement whereby previous competitors in the hardboard business agreed to act as "agents" for the holder of certain fundamental patents for masonite that had the effect of dividing the market, fixing prices, and stifling an historically competitive business. The *Masonite* Court noted that to permit such an agency relationship would allow a "patent . . . owner,

---

[4] *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co*., 152 US at 432 ("The patentee having once received his royalty upon such device, he cannot treat the subsequent seller or user as an infringer."); *Univis*, 316 US at 250 ("His monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article."); *Jazz Photo Corp. v. ITC*, 264 F.3d 1094, 1105 (2001) ("exhaustion of the patent right depends on 'whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article.'" (quoting *United States v. Masonite Corp*., 316 U.S. at 278)).

under the guise of his patent monopoly, not merely to secure a reward for his invention but to secure protection from competition which the patent law, unaided by restrictive agreements, does not afford." 316 U.S. at 279.

While the District Court correctly cited to rewarding inventors as a purpose of patent law, the "reward of inventors is secondary." *Id*. at 278 ("'Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded.'" (*quoting Kendall v. Winsor*, 62 U.S. 322, 329 (1959))). "It is the public interest which is dominant in the patent system." *Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661, 665 (1944). The breadth of the patent law is simply not dictated by "[t]he necessities or convenience of the patentee." *Id.*

Where the intent to transfer ownership is uncontested, no reported opinion questioned the adequacy or the form of the reward received by the patentee or even whether the patentee received any consideration at all.[5] *TransCore v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1277 (Fed. Cir. 2009) (covenant not to sue in settlement agreements triggered exhaustion). To the contrary, both

---

[5] Instead, this Court has looked to the consideration given to determine whether the patentee intended to transfer all title in a patented article or simply to grant a limited license. *Princo Corp. v. International Trade Com'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) ("That 'exhaustion' doctrine does not apply, however, to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee"); *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1369-70 (Fed. Cir. 2006) (same) (overruled on other grounds by *Quanta*, 553 U.S. 617).

involuntary sales and sales by vendors pursuant to contractual remedies trigger exhaustion. *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 922 (Fed. Cir. 1995) (manufacturer of patented knifes could sell irrespective of patent right when patentee failed to pay for manufactured product); *Wilder v. Kent*, 15 F. 217, 219 (C.C.WD. Pa. 1883) (sheriff sale following seizure gave owner right to use); *Static Control Components v. Lexmark, Inter., Inc*., 615 F.Supp.2d 575, 586 (E.D. Ky. 2009) ("regardless of the fact that Lexmark may not have received the full value of its Prebate cartridges, after *Quanta* Lexmark may not invoke patent law in order to enforce its Prebate terms").  While in its most recent pronouncement, the Supreme Court in *Quanta* reaffirmed that patent exhaustion requires an "authorized sale," the opinion mentions nothing about the need for the patentee to receive any "reward" at all.  *Quanta*, 553 U.S. at 636-637 (finding that the licensor had the authority to sell).

Lifescan alone has decided to give diabetic patents free of charge OneTouch Ultra starter kits, which include, among other things, a meter and test strips. Lifescan expects that patients receiving a free system will purchase additional OneTouch Ultra test strips rather than acquiring a competitor's meter.  [A-319 at ¶ 13]  This business strategy rewards Lifescan handsomely, albeit not at the instant its ownership in a starter kit is relinquished.

Apparently unwilling to speculate as to when the reward derived from future strip sales might finally trigger exhaustion under its "reward theory," the District

Court simply concluded that "because [Lifescan] here [does] not receive any reward at the time of distribution, [Lifescan] is likely show that patent exhaustion is not triggered by the free distribution of its OneTouch Ultra kits."  [A-10:5-6] That conclusion finds no support in the law.[6]

Contrary to the District Court's conclusion, when a reward is received is irrelevant to exhaustion.[7] *Tessera, Inc. v. International Trade Com'n*, 646 F.3d at 1370.  In *Tessera*, this Court rejected the contention that exhaustion triggers only after the patentee actually receives its reward.  "That absurd result would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of the licensee, and would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit post-sale restrictions on the use of a patented article."  646 F.3d at 1370.  Holding that exhaustion can trigger only if the patentee receives its full reward at the time transfer goes beyond what this Court

---

[6] The District Court's conclusion that the lack of monetary compensation at the point of disposition determines that Lifescan has not been rewarded at that time is also contrary to the basic economics of gifts and well-accepted principles of the influence of gifts – *i.e.* there really is no such thing as a benevolent gift. *See, e.g.* Piascik, *Gifts and Corporate Influence in Doctor of Pharmacy Education*, 71 Am. J of Pharmaceutical Education (4) Art. 68 at 1 (2007) ("Corporate gifts do influence college and school administrators and students.").  Available online at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1959208/.

[7] If adequacy of a reward was considered, there can be no question that, at the time of the preliminary injunction hearing, Lifescan had already earned its reward with respect to any patient who could use a Genstrip.  As required by the FDA, the GenStrip includes labeling limiting the test strips' use to OneTouch Ultra meters acquired by patients before July 2010.  These patients have already purchased directly or indirectly hundreds of OneTouch Ultra test strips.  [A-9:25-26, A-1337 ¶ 10, A-2130:21-24]

already found "absurd" in *Tessera*.  Courts will not permit patentees to manipulate the concept of a sale to avoid exhaustion in the hopes of extending their patent monopoly to downstream transactions and avoiding restraint of trade charges. *United States v. Masonite Corp.,* 316 U.S. at 280 ("So far as the Sherman Act is concerned, the result must turn not on the skill with which counsel has manipulated the concepts of 'sale' and 'agency' but on the significance of the business practices in terms of restraint of trade.").

Even if this Court were to find that the reward Lifescan receives from subsequent purchase of OneTouch Ultra test strips should not be considered, nothing justifies treating the transfer of ownership of a patented article more liberally than the voluntary transfer of ownership of any other personal property. If anything, the right should be construed more narrowly because "the scope of the right to 'vend' cannot be determined by reference to the private law of sales alone." *United States v. Masonite Corp*., 316 U.S. at 280.  "Since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute."  *Id.*; *Mercoid Corp*., 320 U.S. at 666 ("The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use.")

Copyright law illuminates this issue. Congress enacted the copyright law to reward authors for their creative works but, like patent law, such reward is of a secondary concern. *United States v. Paramount Pictures*, 334 U.S. 131, 158 (1948) ("The copyright law, like the patent statutes, makes reward to the owner a secondary consideration."). In copyright, there is simply no question that the right to vend incorporates the right to give away and that the voluntary relinquishment of ownership of a copyrighted work constitutes a first sale extinguishing the copyright owner's rights in that copy of the work. *Amer. Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299 (1907) ("it is well to remember that the property of the author or painter in his intellectual creation is absolute until he voluntarily parts with the same");[8] *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1183 (9th Cir. 2011) (sale included the transfer of ownership for free of a promotional CD preventing record company from prohibiting resale of the CD). Long ago, the Supreme Court recognized that "[i]n providing for grants of exclusive rights and privileges to inventors and authors, we think Congress had no intention to use the term 'vend' in one sense in the patent act and 'vending' in another in the copyright law. Protection in the exclusive right to sell is aimed at in both instances, and the

---

[8] Obviously, the "absoluteness" of an author's property interest in an intellectual creation has been "tempered in practice by the equitable nature of the fair use doctrine." *Harper & Row Pubs., Inc. v Nation Enters.*, 471 U.S. 539, 551 (1985).

terms used in the statutes are to all intents the same."[9]  *Bauer & Cie v. O'Donnell*, 229 U.S. at 13; *Boston Store of Chicago v. American Graphophone Co.*, 246 U.S. 8, 23 (1918) ("That the exclusive right to vend given by the patent law ha[s] the same significance which had been affixed to that word in the copyright law.").[10]

Lifescan does not dispute that it voluntarily relinquishes ownership in the OneTouch Ultra starter kits and meters it distributes.  *Boston Store of Chicago*, 246 U.S. at 23 ("[W]hen the holder of a patented article had sold it, the article so sold passed out of the monopoly, and the right to make future sales by one who bought it was not embraced by the patent law. . . .").  Since, like general property law, courts recognize that the right to sell in copyright law embraces the right to

---

[9] The schemes differ, however, in that the patent act grants an exclusive right to use not found in copyright law.  From this exclusive right to use alone, courts have distinguished copyright law and the patent act, allowing in certain instances patentees the right to place restrictions on the use of a patented article.  *Bobb-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1909) (the right to vend under copyright law does not extend to allow the holder to place restrictions on subsequent sales).  In *Bobb-Merrill*, the Supreme Court indicated that the exclusive right to use provided by the patent act made a patent decision not relevant with respect to a copyright holder's ability to place use restrictions on copyrighted articles sold.  *Id.* at 346.  Consistent with its conclusions in patent law, the Supreme Court ultimately concluded that the first sale doctrine would bar a copyright holder from fixing the price at which a copyrighted work could be resold.  *Id.* at 351.

[10] While Congress codified the rights of persons who lawfully come into possession of a copyrighted work, this codification was not a change in the law, but simply congressional adoption of this court-made doctrine.  *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 US 135, 141-142 (1998) ("Congress subsequently codified our holding in *Bobbs-Merrill* that the exclusive right to 'vend' was limited to first sales of the work.").  The mere fact of congressional endorsement in copyright law cannot be read as importing an unwritten restriction on the doctrine's application in the patent act.

28

give away, and since copyright law's right to vend should be read as coextensive with the patent act, Lifescan's voluntarily relinquishment of ownership terminates its monopoly over the property it distributes – irrespective of whether Lifescan has or will receive any monetary "reward" for the transfer.  The District Court's conclusion to the contrary is error.

**B.    A Feature Abandoned During Prosecution Cannot Be An Inventive Feature of a Patent Sufficient to Defeat Exhaustion.**

███████████████████████████████████████████

███████████████  Significantly, the District Court did not cite the adequacy of Lifescan's "reward" as a reason for forestalling exhaustion with respect to the discounted meters.  Instead, the District Court concluded that the meter alone failed to embody the "inventive features" of the '105 patent and, therefore, Lifescan would likely prevail against any claim of exhaustion.  [A-14:8-9, A-2065:6-8]

The Supreme Court in *Quanta* noted the article need not "completely practice the patent" for exhaustion to apply.  *Quanta*, 553 U.S. at 633.  "The relevant consideration is whether [the article subject to the exhaustion analysis] that partially practice a patent – by, for example, embodying its essential features – exhausts *that* patent."  *Id.* at 635 (emphasis in original).

Articles "embody the essential features of [a patent if] they carry out all of the inventive processes."  *Id.* at 634.  In *Quanta*, the Court concluded that the

article at issue embodied the inventive features because what was not practiced by the article were simply standard components. *Id.* Cases following *Quanta*, which coincidently involve the same technology at issue in *Quanta*, have not read "inventive features" narrowly. *LG Electronics, Inc. v. Hitachi Ltd,* 655 F.Supp.2d 1036, 1043 (N.D. Cal. 2009). "The mere fact that a component is necessary to practice the patent does not mean that it reflects an inventive aspect of the patent . . . ." *Id.* at 1043; *Acco Brands, Inc. v. PC Guardian Anti-Theft Product*, 2008 WL 3915322, *2 (N.D. Cal. 2008) (question of fact as to whether article sold embodied "the critical element of the . . .patent that distinguished it from the prior art"). The *LG Electronic* court added that even though a necessary step in the method was "accomplished by a proprietary (and, by implication non-'standard' chipset)" that "d[id] not mean that the chipset itself emodie[d] an inventive aspect" of the patent-in-suit. *Id.*

Lifescan agrees that the "innovation" claimed in the '105 patent is "the idea of comparing the current from the two working sensors and seeing if they're in substantial agreement or not. That is the crux of the invention." [A-2108:23-2109:1] There is no dispute that the meter alone performs this measuring and comparing. [A-2066:16-25] Summarizing the examiner's reason for allowance, Lifescan told the District Court that:

> [T]he examiner says here are the reasons that I am going to let this patent issue, even though I'm not going to let you get a patent on the strip all by itself. [¶] And that is

> because [the application] has this method of measuring
> and comparing . . . it's comparing the electr[ic current]
> from each working sensor part.

[A-2009:17-23]

Lifescan is correct that the '105 patent is not infringed "by a test strip alone [nor is it] infringed by the meter alone. It's infringed only when those things are brought together." [A-2106:12-14] "The direct infringement occurs when a customer takes a test strip and puts it in the meter and all of these things happen, then the patented method is performed and infringement occurs." [A-2106:15-20] Not even Lifescan, however, contends that this is a case "in which the combination itself is the only inventive aspect of the patent." *Quanta*, 553 U.S. at 635. Consistent with *Quanta*, the mere fact that the meter must be used in combination with a disposable test strip does not alone render the disposable test strip an inventive feature.

The District Court concluded that inventive features of the '105 patent are found in the disposable test strip precluding any finding of exhaustion. [A-14:1-7] In discussing exhaustion, the District Court's Order curiously ignores the patent examiner's repeated rejection of the inventors' effort to patent the test strip alone for lack of novelty.[11] In its discussion of obviousness, however, the District Court

---

[11] During the prosecution of what matured into the '105 Patent, the examiner rejected all claims directed to the disposable test strip "under 35 U.S.C. § 102(e) as being anticipated by Fujwara et al. (US 6,004,441)." [A-1328-1333, A-1843-1847]. During the prosecution of the '714 application, the same examiner rejected most claims directed to the disposable test strip "under 35 U.S.C. 102(e) as being

31

did mention the examiner's notice of abandonment with respect to the final application seeking to patent the test strip. Specifically, the District Court wrote that "a company's decision to abandon a patent application may be made on any number of bases. Therefore, the [District C]ourt does not find that the that the USPTO's rejection of the '714 patent application or [Lifescan's] subsequent abandonment of that application generates a substantial question" of any import. [A-22:13-18] The District Court's conclusion is in error.

No reported opinion addresses whether features abandoned by inventors during prosecution can be deemed an "inventive feature" sufficient to defeat a claim for exhaustion. It is, however, obvious that an "inventor must comply with the conditions prescribed by law [for the protection of his invention]. If he fails to do this he acquires no title, and his invention or discovery, no matter what it may be, is lost to him and is henceforth no more his, than if he had never been in any wise connected with it. It is made, thereupon . . . irrevocably a part of the public domain." *Consolidated Fruit-Jar Co. v. Wright*, 94 U.S. 92, 97 (1876) (held to have abandoned invention by failing to timely file an application). "Since [the inventors] neither responded to the rejection of claims . . . before the primary examiner nor appealed the rejection to the board, [the] claims. . . are treated as having been abandoned." *In re Yamamoto*, 740 F.2d 1569, 1573 (Fed. Cir. 1984);

---

clearly anticipated by Winarta et al. US 6,258,229 B1 ('Winarta')" and all of the claims under 35 U.S.C. 103(a) as being unpatenable over Nankai et al US 5,120,420" or Winarta. [A-992-1004]

37 C.F.R. § 1.135(a) ("If the applicant of a patent application fails to reply with the time period provided . . . the application will become abandoned").

While in certain instances abandoned claims can be revived, Lifescan here made no such attempt, but instead simply continued to publicly sell strips that it now contends practice the abandoned claims.[12] *Haynes Intern., Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578 (Fed. Cir. 1993) ("the estoppel arises not only from the cancellation of original claims . . . but also from the failure to continue prosecution of these claims (in a continuation or reissue application) in light of the Board's action."). Lifescan "chose [to] abandon its right to review . . . and acquiesced… [Lifescan] is now bound to its acquiescence." *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1440 (Fed. Cir. 1984) (overruled on other grounds by *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 563 (1992)). The abandoned claims that sought to cover the disposable test strip are now and forever unpatentable. 35 U.S.C § 102(c).

---

[12] The District Court adopted Lifescan's argument that abandonment should not be found because Lifescan may have had many other reasons for not pursuing this application. [A-22:13-18] Objective intent and not Lifescan's subjective intent, however, is what matters. *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1323 (Fed. Cir. 2006) ("It is clear that in determining whether 'surrender' of subject matter has occurred, the proper inquiry is whether an objective observer viewing the prosecution history would conclude that the purpose of the patentee's amendment or argument was to overcome prior art and secure the patent."). Objectively, Lifescan's decision not to respond to the examiner's rejection coupled with its decision to sell a strip that it contends practices the abandoned claims leads to no conclusion other than an intent to abandon.

To bring the test strip within the zone of the "inventive features" of the '105 patent now runs counter to the long established principle that "[a]n unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989) ("the efficient operation of the federal patent system depends upon substantially free trade in publicly known, unpatented design and utilitarian conceptions").

The District Court correctly found that a disposable test strip of a particular design was "an important component of the '105 patent's invention." [A-13:8-9] As indicated above, however, the mere fact that a component is necessary to a method does not render it an "inventive feature." *LG Electronics, Inc. v. Hitachi Ltd*, 655 F.Supp.2d at 1043. In deciding what limitations embody the "inventive features" for purposes of exhaustion, the Court should look to recognized claim construction principles. For example, "a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21, (1940). Similarly, "prosecution history estoppel acts as one check on application of the doctrine of equivalents, by precluding a patentee from regaining, through litigation, coverage of subject matter relinquished during

prosecution of the application for the patent." *Wang Laboratories, Inc. v. Mitsubishi Electronics America*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997) (citations omitted); *Mark I Marketing Corp. v. Donnelley & Sons Co*., 66 F.3d 285, 291-292 (Fed. Cir. 1995) (recognizing the estoppel extends across applications in the same family). The District Court erred in concluding that the disposable test strip fell within the zone of the "inventive features" claimed in the '105 patent preventing exhaustion from applying to Lifescan's sale of its OneTouch Ultra meter alone.

**C.      The Package Notice, Which States that the Permitted Use of a OneTouch Ultra Meter is Limited to OneTouch Ultra Strips, Does Not Prevent Patent Exhaustion**

Because the District Court ruled that neither the free distribution of OneTouch Ultra systems nor the sale of any OneTouch Ultra meter alone could trigger patent exhaustion, the District Court did not address Lifescan's limitation on use noted on its packaging.[13] Specifically, on the bottom of the packaging encasing each OneTouch Ultra starter kit and meter is the following:

> Use of the monitoring device included here is protected under one or more of the following U.S. patents: 7,250,105…. Purchase of this device does not act to grant

---

[13] Lifescan spent some time arguing that its meters have a non-infringing use. [A-1421-1422] Whether or not the meters could have any reasonable non-infringing use, however, is simply of no import to the determination of patent exhaustion. *TransCore v. Electronic Transaction Consultants Corp*., *supra*., 563 F.3d at 1274, n. 1.

> a use license under these patents. Such a license is
> granted only when the device is used with OneTouch®
> Ultra® Test strips.

[A-367]  Lifescan below argued that this language established a limited license to

use any OneTouch Ultra meter and not a sale within the meaning of patent

exhaustion.  [A-1424]

### 1. There is No Contractual Relationship Between Lifescan and Patients Using OneTouch Ultra Meters

Before the Supreme Court decided *Quanta*, this Court long recognized that a

patentee could, consistent with the laws of contract, condition the sale of a patented

article so long as the condition did not violate some other law or policy.

*Mallinkrodt, Inc. v. Medipart, Inc*. 976 F.2d 700, 708 (Fed. Cir. 1992).  Lifescan's

desire to limit the use of its OneTouch meter, "'unless embodied in an enforceable

contract, does not create a limitation on the right of a purchaser to use, sell or

modify a patented product.'"  *Jazz Photo Corp. v. ITC*, *supra*., 264 F.3d at 1108

(*quoting Hewlett-Packard v. Repeat-O-Type Stencil, Mfg. Corp., Inc.*, 123 F.3d

1445, 1453 (Fed. Cir. 1997).  For example, in *Jazz Photo*, this Court held the

notation that a disposable camera was for single use only did not create an

enforceable license.  *Id.* ("There was no showing of a 'meeting of the minds'

whereby the purchase . . . may be deemed to have breached a contract or violated a

license . . .").

Nothing suggests that, when a health care provider gives his or her patient a OneTouch Ultra starter kit, there is a "meeting of the minds" between that patient and Lifescan such that a binding contract restricting the patient's use of the meter is established. *Cf. UMG Recordings, Inc. v. Augusto*, 638 F.3d at 1183 (the mailing of promotional CDs affixed with "no resale" stickers did not create a binding contract between a record company and the recipient of the CD). Similarly, Lifescan offered nothing below that would allow this Court to conclude that patients who purchased OneTouch Ultra meters knowingly agreed to the limitation on use that Lifescan affixed to the bottom of the box sufficient to form a binding contract. *Softman Products Co., LLC v. Adobe Systems, Inc*., 171 F. Supp. 2d 1075, 1087 (C.D. Cal. 2001) (drawing distinction between reading notice on software box stating use subject to license agreement, and agreeing to license terms during installation).

Even if Lifescan presented evidence to establish the necessary contractual relationship, which it did not, in *Quanta*, the Supreme Court decided that contractual limitations on use do not forestall patent exhaustion.[14] 553 U.S. at 637.

---

[14] The *Quanta* Court decision is not without ambiguity. *See* Chiapetta, *Patent Exhaustion: What is it Good For?*, 51 Santa Clara L. Rev. 1087 (2011) ("Many hoped the Court's most recent consideration of the doctrine in *Quanta Computer, Inc. v. LG Electronics, Inc.*would provide the needed clarification. Instead, the decision produced yet more confusion."); Rinehart, *Contracting Patents: A Modern Patent Exhaustion Doctrine*, 23 Harv. J. of Law & Tech 486 (2010) ("Lower courts, scholars, and owners or users of patented technology have tried to read the tea leaves in *Quanta* to guide them in close cases within previously

The Supreme Court rejected LG Electronics' argument that its express disclaimer

of any third party license to practice its patents (when the licensed products were

combined with other components) should prevent exhaustion. *Id.* Instead, the

*Quanta* Court recognized that while LG Electronics had exhausted its rights under

patent law, it still may have claims for breach of contractual limitation on use.[15]

*Id.* at n.7; *Static Control Components, Inc. v. Lexmark Intern.*, 615 F.Supp.2d at

584 ("Lexmark attempts to reserve patent rights in its products through post-sale

restriction on use imposed on its customers. This is what *Quanta* says, Lexmark

---

unexplored areas of patent law, to lament (or laude) the Court's opinion, or to determine whether any existing licensing strategy survives the exhaustion analysis."). The *Quanta* Court did reverse the Federal Circuit's decision that post-sale restriction placed on components sold by an authorized seller prevented exhaustion. The *Quanta* Court, however, concluded that even though a patentee provided clear notice to the licensee that it wanted such a restriction, the patentee failed to include any such limitation in the authorized seller's license to sell. *Quanta*, 553 U.S. at 636. The *Quanta* Court, however, states that while "patent exhaustion prevents [the patentee] from further asserting its patent rights, the Court adds in footnote 7 that "we note that the authorized nature of the sale to Quanta does not necessarily limit [the patentee's] other contractual rights." *Id.* at 637.

[15] The Supreme Court decision in *Quanta* would seem to narrow this Court's decision in *Mallinkrodt*. Specifically, in *Mallinkrodt*, this Court recognized that nothing in the patent act prevents a patentee from placing conditions on a sale. 976 F.3d at 708 (rejecting that existing case law stood "for the proposition that no restrictions or conditions may be placed on the sale of a patented article"). If, however, a transfer results in the complete passage of title to a patented article, *Quanta* arguably overrules *Mallinkrodt*, to the extent the latter held that a "violation of the restriction [on use] may be remedied by action for patent infringement." *Id.* at 709. Consistent with the treatment in copyright law, the Court should look to the agreement between the parties to determine whether ownership has been transferred or whether the acquirer has simply obtained a license to use. *Vernor v. Autodesk, Inc*., 621 F.3d 1102, 1107 (9th Cir. 2010) ("The first sale doctrine does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee.").

cannot do."). Since Lifescan makes no claim of any retained ownership in the OneTouch Ultra meters possessed by patients, its patent rights are extinguished as to those meters. What, if any, use restriction may persist, affords Lifescan at most contractual remedies against such patients.

### 2. Lifescan's Purported Contractual Limitation on Use is Anti-Competitive and Unenforceable

Even if after *Quanta* this Court were to conclude that a binding contractual restriction on sales can forestall exhaustion, which it should not, the limitation Lifescan seeks to impose would violate the antitrust laws and should not be enforced. *Mallinkrodt, Inc.* 976 F.2d at 708 (conditions that will effectuate a violation of antitrust law remain unenforceable). Specifically, Lifescan's efforts to require only OneTouch Ultra test strips be used with OneTouch Ultra meters creates an illegal tying arrangement in violation of Section 1 of the Sherman Act.[16]

Obviously, "[n]ot all tying arrangements are illegal. Rather, ties are prohibited when a seller 'exploits,' 'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied product*." Rick-Mik Enterprises v. Equilon Enterprises*, 532 F.3d 963, 971 (9th Cir. 2008). "In all of th[e]se instances, the justification for the challenge rested on either an assumption or a showing that the

---

[16] Because neither Lifescan nor the Court discussed whether this limitation on use could constitute an illegal tying arrangement, the discussion here is merely a summary of the more extensive argument presented in opposition to the motion for preliminary injunction. [A-533-537]

CONFIDENTIAL INFORMATION REDACTED

defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34 (2006).



Lifescan and its "competitors" (1) follow the identical strategy of selling glucose monitoring meters that work only with their unique test strip; (2) refrain from developing strips compatible with a competitor's meter, and (3) annually

increase the price of their test strips by about 5%. *Moore*, 550 F.2d at 1211 (the eight mortuaries that followed the same tying strategy accounted for 78% of the relevant market). Where, as here, the market follows a uniform pattern of business that excludes meaningful competition, requisite market power can exist with a market share well below 30%. *Rosenbrough Monument Co. v. Memorial Park Cemetery*, 666 F.2d 1130, 1143 (8th Cir. 1981) (in reversing a lower court decision finding no illegal tie, the Eighth Circuit found as sufficient proof of market power that "[a]ppellees accounted for 22 percent of the burials performed in the market area in 1978, and the exclusive foundation preparation policy, upon which appellant bases its claim, is uniformly followed by nearly all of the cemeteries in St. Louis.").

## II.    INFRINGEMENT

As noted by the District Court, Lifescan's likelihood of success on its claim for infringement turns on whether the OneTouch Ultra meter "measure[s] an electric current at each working sensor part proportional to the concentration of said substance in the sample liquid" as required by Claim 1 of the '105 patent. [A-15:26-16:6, A-2061:17-19] Specifically, the infringement issue is dependent upon the construction given to "proportion(al)." Appellants and Lifescan surprisingly dispute very little. In fact, they agree on each of the following:

- The term "proportion(al)" is used two ways in Claim 1. First, referring to the proportional relationship between the charged carriers

generated at a sensor part and the concentration of, in this case, glucose in the blood sample. And second, to "measuring an electric current at each working sensor part proportional to the concentration of said substance in the sample liquid." [A-947 at 6:55-7:14].

- The proportional relationship between the charged carriers generated at a sensor part and the concentration of, in this case, glucose in the blood sample is a fixed ratio and is recognized as such in the art. [A-875 ¶ 14][17] More particularly, for every glucose molecule that reacts on a glucose test strip, two charge carriers are generated. [A-933 at 4.2]

- The current measured by the OneTouch Ultra (or any other commercially available blood glucose monitor) at the working sensor part is not in a fixed ratio to the glucose concentration in the blood sample due to (for example) background current and ambient

---

[17] Lifescan repeatedly attempted to merge this acceptance in the art that charge carriers generated are proportional – *i.e.* in a fixed ratio – to glucose in the blood sample with the measuring limitation in an effort to show that the art applies a relaxed definition of proportional. [*See, e.g.,* A-1426:5-7] In contrast, however, when referring to what is measured, the art does not refer to the relationship as "proportional" but rather to a relationship that is "correlated to" or "depending upon." [A-538:20-28, A-1221 3:56-66, A-1619 at 12:25-29 ("After a predetermined period of time, a desired potential is applied to the working electrode… based on the potential at the counter electrode . . . and a current value 5 seconds after the application is measured. As a result, a current response depending upon the concentration of glucose in the sample liquid obtained.")]

influences such as temperature; though there is a correlation.  [A-1483 at ¶ 148]

- The '105 patent specification refers only to the known proportional relationship between the charge carriers generated to the concentration of glucose in a blood sample.  [A-945 at 1:33-38, 2:3-9; 2:20-26; 2:64-68]

- A fixed ratio is a relationship closer than a mere correlation.  [A-1483 at ¶ 147, 2059:5-9]

Appellants have presented intrinsic and extrinsic evidence and argued that "proportion(al)" should be consistently construed as "in a fixed ratio," which is the term's ordinary meaning in the art and consistent with the record here.  And once it is clear that "proportion(al)" means "in a fixed ratio" with respect to <u>generating</u> charge carriers, the term should retain that meaning throughout the claims – including for <u>measuring</u> current.  *See Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002) ("A claim term used in multiple claims should be construed consistently.").

The District Court rejected Appellants' construction for three reasons: (a) Appellants' obviousness arguments utilize Lifescan's construction; (b) according to Appellants' Instructions for Use ("IFU") provided to the FDA with the intent of being included in product packaging, "[g]lucose in blood combines with an enzyme in the [GenStrip].  This produces an electric current in the Meter in

43

proportion to the glucose level"; and (c) the District Court impermissibly focused on the downstream effects of Appellants' construction and Lifescan's commercial embodiments.  [A-15-17]

But Appellants did not use any of the references presented in obviousness challenges under 35 U.S.C. § 103 to define "proportion(al)" in a way that does not include a fixed ratio.  Instead, the obviousness arguments were presented as an alternative using Lifescan's construction in case the invalidity challenges under §§ 101 and 112 were denied (*i.e.*, if Appellants' construction were rejected).  [A-541:15-18 ("…Winarta…would…measure an electric current…proportional to the concentration…if that element is not invalid under… § 112")]

The IFU focuses on <u>generated</u> current, which is in a fixed ratio to glucose concentration and entirely consistent with Appellants' construction.  Nowhere does the IFU say that <u>measured</u> current is proportional to glucose concentration.  Accordingly, the IFU provides no reason to reject Appellants' construction.

Finally, it is reversible error to construe claims based on a commercial embodiment of the invention.  *See Wang Laboratories, Inc. v. America Online, Inc.,* 197 F.3d 1377, 1383 (Fed. Cir. 1999) (inability to commercially implement an invention is not relevant to construction); *Int'l Visual Corp. v. Crown Metal Mfg. Co., Inc.,* 991 F.2d 768, 771-72 (Fed. Cir. 1993) (reversing claim construction based on commercial embodiment).  Appellants appreciate that it may not be common practice for an inventor to draft his claims so as to exclude a commercial

44

embodiment.[18]  This case is not so simple, however, as Lifescan's original method claim in the application that led to the '105 patent did not include the "proportion(al)" measuring step.  [A-1027, A-1041]  Having added this step through prosecution, it is clear that any failure to cover a commercial (or even a preferred) embodiment is irrelevant to claim construction even if commercial embodiments were impermissibly considered.   The District Court's concerns about "incorrect science," and particularly third party patents, are unwarranted since those references are actually consistent with Appellants' construction and do not affect the ordinary meaning of "proportion(al)."   In any event, it is error to construe a claim to contradict its plain language in order to avoid a nonsensical result.  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010).  Even when a patent claims a physical impossibility, the plain meaning must control.  *See International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004).

Because "proportion(al)" should be construed as "in a fixed ratio" and because the accused device is not used to measure current in a fixed ratio as claimed, there should be no infringement.

---

[18] The preferred embodiment set forth in the '105 patent specification does not describe in any way the relationship between the current measured and the sample. [A-947 at 5:26-28 ("After a predetermined time the electric current generated by each working sensor part is measured and the two measurements are compared.")] In the absence of any relational reference in the preferred embodiment, the claim does not necessarily exclude the preferred embodiment.

## III.   INVALIDITY

A defendant's burden in the preliminary injunction context to show a substantial question of invalidity does not equate to the "clear and convincing" standard required to invalidate a patent at trial.  *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir. 2008) ("a showing of a substantial question of invalidity requires less proof than the clear and convincing standard to show actual invalidity").  "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).  Appellants' obviousness contentions, when properly analyzed, carry their burden of showing substantial questions regarding invalidity.  And, conversely, Lifescan has not – and cannot – carry its burden of establishing that the invalidity arguments lack substantial merit.

The District Court rejected Appellants' obviousness contentions for four reasons:

(1) the USPTO had already considered some of the references and some of the other references were "arguably cumulative," citing *OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*, 701 F.3d 698, 705 (Fed. Cir. 2012);

(2) the art was allegedly "not concerned with the problems Plaintiffs addressed in the '105 Patent"  and motivation for combining references allegedly does not exist;

(3) Appellants' contentions allegedly do not meet all of the claim limitations; and

(4) secondary considerations of nonobviousness.

[A-24-26]

But using the District Court's apparent claim construction for "proportion(al)," the District Court clearly erred in addressing each of these issues and finding that Appellants' obviousness arguments "lack substantial merit."[19]

## A.    Prior USPTO Citation of References does not Lead to the District Court's Conclusion

Simply put, the District Court misapplied dicta from *OSRAM*.  In *OSRAM*, the Federal Circuit merely clarified that, "[w]hile prior consideration of a reference during prosecution may carry some weight, the burden to prove invalidity does not change."  701 F.3d at 705.  The record is devoid of any case where the USPTO's prior consideration of a reference formed the basis (or even actually carried weight) for finding that an obviousness argument under 35 U.S.C. § 103 "lacks substantial merit" such that a preliminary injunction should be granted.  Indeed, patent claims are often found invalid under § 103 based on references previously considered by the USPTO.  For example, in *Sciele Pharma Inc. v. Lupin Ltd.*, the

---

[19] The District Court's obviousness analysis is furthermore incomplete because it fails to define a person of skill in the art.  [A-21 n. 1] *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (the issue of obviousness is determined entirely with reference to a hypothetical "person having ordinary skill in the art").

Federal Circuit overturned a preliminary injunction because references previously

considered by the USPTO raised a substantial question of invalidity under § 103.

684 F.3d 1253, 1261-62 (Fed. Cir. 2012).  In any event, the District Court only

noted that Say ('752) is "arguably" cumulative and completely failed to appreciate

that the cited sensor arrangement in Winarta ('229) is not found in Winarta ('451).

The District Court also failed to appreciate that, when considering Nankai

('420) and Winarta ('229) in the connection with the subsequent '714 application

directed to the test strip claimed in the '105 patent (without the steps associated

with the meter and claimed in the '105 patent), the USPTO rejected those claims

and the application was abandoned.  *Microsoft Corp. v. i4i Ltd. P'ship,* __ U.S. __,

131 S. Ct. 2238, 2243 (2011) ("the basic proposition that a government agency

such as the [PTO] was presumed to do its job") (citations omitted).  Appellants'

invalidity contentions address those method steps through references previously

not considered (*e.g.*, Say '752) and other references that were not considered as

presented by Appellants.

Thus, the District Court's first reason for rejecting Defendants' obviousness

arguments cannot stand.

**B.    Appellants Presented Articulated Reasoning with Rational**
**Underpinnings to Support the Legal Conclusion of Obviousness**

As a matter of law, the problems that motivated the "invention" have no

bearing on the reasoning behind Appellants' proposed combinations of references

under 35 U.S.C. § 103.  *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368-1369 (Fed. Cir. 2012).  Therefore the District Court's treatment of this issue and repeated attention to the inventors' motivation and problem solved was in error.

Further, the District Court indicated that Appellants' challenges may be based on improper hindsight, as it is not clear why one of skill in the art would combine references.  [A-24]  And, according to the District Court, "even assuming that the elements of multiple working sensors of equal size, arranging those sensors in a downstream configuration, taking multiple measurements, and comparing the measurements to determine error were known, the result of the combination of those elements is not predictable."  [A-23]  That statement is wholly inconsistent with the evidence of the case, and the District Court points to nothing in support beyond the asserted problems that motivated Plaintiffs to make their "invention."  In fact, as Dr. Wang – Appellants' expert, who has impeccable qualifications for assisting the Court – provided in detail, the combination of prior art elements here is "nothing more than the use of…known technique[s] to improve similar devices/methods in the same way, and the results would be predictable."  [A-879-880 at ¶ 35]

Far from "hindsight," this articulated reasoning is exactly the kind of analysis required by the Supreme Court to establish obviousness.  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of

obviousness") (*citing In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Indeed, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *Id.* at 401.  Additionally "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."  *Id.* at 417.  Thus, it should be apparent that the type of reasoning employed by Appellants is explicitly accepted as basis for invalidating a patent claim under 35 U.S.C. § 103 (and, accordingly, not impermissible hindsight).  For each of these reasons, the District Court's second reason for rejecting Appellants' obviousness arguments was erroneous.

### C.    Appellants' Proposed Obviousness Rejections Meet all Claim Limitations

Appellants presented various combinations of references challenging claims 1 and 3 as obvious under 35 U.S.C. § 103.  For example, Appellants asserted obviousness based on U.S. Pat. No. 5,120,420 to Nankai in view of U.S. Pat. No. 6,175,752 to Say, either alone or in further view of U.S. Pat. No. 6,258,229 to Winarta.   The District Court found all of Appellants' challenges to be inadequate in two ways.  Specifically, Appellants "have not sufficiently demonstrated that the idea of using two working sensors of identical size and composition, or comparing

the sensor readings in a way other than averaging them would have been obvious to a person of skill in the art." [A-23]

But, according to the District Court, "Nankai '420 teaches the averaging of readings from multiple sensors, and arguably addresses the need for sensors to be the same size." [A-23-24]  This observation is consistent with Dr. Wang's testimony and Appellants' obviousness contentions, that in Nankai ('420) the "first and second working sensor parts 43, 42 are constructed in the same manner, include the same reagent, and are the same size." [A-1301]  The District Court's inconsistent (and unexplained) conclusion that Appellants have not sufficiently demonstrated using two working sensors of identical size and composition is clear error and without foundation.

The District Court also indicated that, "Say '752 describes comparing readings from multiple sensors to determine inaccuracies." [A-23]  This is also consistent with Dr. Wang's testimony and Appellants' obviousness contentions, that "Say ('752) discloses that when readings are taken from multiple electrodes, they should be compared to one another to identify errors. [A-1301]  Accordingly, the District Court's inconsistent (and unexplained) conclusion that Appellants have not sufficiently demonstrated comparing the sensor readings in a way other than averaging is also clear error and without basis.

Especially in light of the District Court's acknowledgement that the cited references do include the only elements that it found to be missing, it is apparent that the District Court erred in analyzing obviousness under § 103 by improperly requiring each individual reference to meet all of the claim limitations. *See KSR*, 550 U.S. at 418 ("Often, it will be necessary for a court to look to interrelated teachings of multiple patents"). Otherwise, there would be no reason for various statements in the District Court's Order, such as "Say '752 … does not teach that the sensors be the same size, or even that multiple sensors must be used." [A-1301] The District Court was also misled by Lifescan's incorrect arguments that their motivation to make the "invention" is essential and must be met by Appellants' contentions, as shown by such statements in this portion of the District Court's Order as "[Appellants' Khazanie and Lichten references]…do not persuasively suggest any reason one of skill in the art would have used [comparisons] to solve the new problems identified by the '105 patent." [A-24]

In any event, it is clear—and the District Court acknowledged—that the cited references *do* include the only elements that it found to be missing. Accordingly, the District Court's third reason for rejecting Appellants' obviousness arguments is also clearly erroneous.

### D.    Secondary Considerations do not Overcome Appellants' Obviousness Challenge

A lack of nexus between the claimed subject matter and the commercial success or purportedly copied features renders proffered objective evidence of secondary considerations uninformative to the obviousness determination. *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1356 (Fed. Cir. 2012) (*citing Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

Here, Lifescan has not – and cannot – establish the required nexus for secondary considerations to be relevant.  Lifescan's own expert did not cite to the claimed features as a reason for the OneTouch Ultra's success.  [A-700]  Instead, Lifescan's expert testified that Lifescan's product is successful because consumers like the brand.  [*Id.*]  This completely destroys any claim of nexus that Lifescan may offer, and is something the District Court completely failed to address.  And even if nexus did exist, secondary considerations in this case could not overcome the strong showing of obviousness. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("Moreover, secondary considerations of nonobviousness… simply cannot overcome a strong prima facie case of obviousness.").  As such, the District Court's final reason for rejecting Appellants' obviousness arguments cannot stand.

## IV. THE DISTRICT COURT ERRED IN CONCLUDING THAT THIS COURT'S "CAUSAL NEXUS" REQUIREMENT FOR IRREPARABLE HARM DID NOT APPLY TO THIS CASE

"[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple*, 695 F.3d at 1374. As to the second factor, "[i]t is not enough for the patentee to establish some insubstantial connection between the alleged harm and the infringement . . . . The patentee must rather show that the infringing feature drives consumer demand for the accused product." *Id.* at 1375. "To establish a sufficiently strong causal nexus [Lifescan] must show that consumers buy the [GenStrip] because it is equipped with the" patented feature claimed in the '105 patent. *Id.* at 1376.

The District Court below abused its discretion finding irreparable harm. The District Court was "not persuaded" that the causal nexus standard, as articulated by this Court in *Apple*, applied to this case. Instead, the District Court stated that "[u]nlike a smartphone, which contains a myriad of features, test strips are designed for use with the OneTouch Ultra meter embody a substantial part of the patented feature and not much else." [A-27:3-7] In essence, the District Court concluded that the mere fact that the GenStrip works with certain OneTouch meters alone creates a sufficient causal nexus. Even if *Apple* should be relaxed in

this context, which it should not, the record in no way supports the District Court's conclusion.

Lifescan identifies "the subject of the '105 patent" to consumers as its "DoubleSure Technology." [A-65:24-25] This "important feature of the OneTouch Ultra system . . . takes two measurements for every blood sample, to protect against error and to provide accuracy in blood glucose measurement." [A-65:10-11] Lifescan specifically and separately references this feature on its packaging and in advertising OneTouch Ultra test strips. [A-65:15-23]



Neither Appellants' packaging nor their advertising indicates in any way that the GenStrip possesses any feature similar to Lifescan's DoubleSure Technology. [A-321, A-398-404]. In fact, when asked, the Lifescan witness in charge of sales for



LifeScan's OneTouch Ultra system did not know one way or another whether the GenStrip had anything like Lifescan's DoubleSure technology. [A-317:2-6, A-596:21-597:23] Instead, he testified that the only reason why a consumer would purchase a GenStrip was its price and because it worked with certain OneTouch Ultra meters. [*Id.*]

The record is devoid of evidence that consumers buy the GenStrip because it utilizes the patented features of the '105 patent. This record, if anything, proves only the absence of any causal nexus – consumers likely purchase the GenStrip believing it lacks the patented feature.

The District Court apparently decided that the requisite causal nexus could simply be inferred. Specifically the District Court stated that Lifescan "becom[ing] the market leader suggests that they possess a superior technology, the technology of the '105 patent." [A-27:3-7] Lifescan, however, does not even argue that its DoubleSure Technology drives consumer demand. In fact, Lifescan's own expert concluded that "driving . . . consumer demand" was a "strong recognizable brand" and not any particular feature of the system. [A-700 at ¶ 13] Even if this Court's decision in *Apple* would allow such an inference of a causal nexus for technology less sophisticated than a smart phone, the absence of anything in the record to support such an inference underscores the error of the District Court's conclusion.

# CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court

vacate the District Court's preliminary injunction and grant such further relief as it

deems appropriate.

DATED:  April 12, 2013                    Respectfully Submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

*Counsel for Defendants and Appellants*
*INSTACARE CORP., and PHARMATECH*
*SOLUTIONS, INC.*

Robert P. Andris
Lael D. Andara
ROPERS, MAJESKI, KOHN &
BENTLEY
1001 Marshall Street, Suite 500
Redwood City, CA 94063-2052

*Counsel for Defendants and Appellants*
*SHASTA TECHNOLOGIES, LLC, and*
*CONDUCTIVE TECHNOLOGIES, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2013, I filed the foregoing Brief of

Appellants with the Clerk of the U.S. Court of Appeals for the Federal Circuit via

the CM/ECF system and served a copy on counsel of record by the CM/ECF

system and by electronic mail to the parties on the service list below:

Eugene M. Gelernter
Kathleen M. Crotty
Gregory Diskant
Charles Davison Hoffmann
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
emgelernter@pbwt.com
kmcrotty@pbwt.com
gldiskant@pbwt.com
choffmann@pbwt.com

Robert P. Andris, II
Lael D. Andara
Ropers, Majeski, Kohn & Bentley
1001 Marshall Street
3rd Floor
Redwood City, CA 94063
randris@rmkb.com
landara@rmkb.com

DATED:  April 12, 2013

Respectfully submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

*Counsel for Defendants and Appellants
INSTACARE CORP., and
PHARMATECH SOLUTIONS, INC.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that Pursuant to Rules 29(d) and 32(a)(7) of the Federal Rules of Appellate Procedure and of Federal Circuit Rule 32(b), the enclosed brief complies with the length limits set forth at Federal Rule of Appellate Procedure 29(d).  The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).  According to the word processing system used to prepare this brief (Microsoft Word 2010), the word count of the brief is 13,944 words not including the certificate of interest, corporate disclosure statement, table of contents, table of authorities, any addendum containing statutes, rules or regulations, and any certificates of counsel.

DATED:  April 12, 2013          Respectfully submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

*Counsel for Defendants and Appellants*
*INSTACARE CORP., and*
*PHARMATECH SOLUTIONS, INC.*

# ADDENDUM

# TABLE OF CONTENTS

Order Granting Motion for Preliminary Injunction . . . . . . . . . . . . . . . . . . . . Tab A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LIFESCAN, INC. and LIFESCAN SCOTLAND, LTD., | Case No.: 5:11-CV-04494-EJD |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| SHASTA TECHNOLOGIES, LLC, INSTACARE CORP., PHARMATECH SOLUTIONS, INC., and CONDUCTIVE TECHNOLOGIES, INC., | **[Re: Docket Nos. 174, 176]** |
| Defendants. | |

This action arises out of Defendants Shasta Technologies, LLC ("Shasta"), Instacare Corp. ("Instacare"), Pharmatech Solutions, Inc. ("Pharmatech"), and Conductive Technologies, Inc.'s ("Conductive") (collectively, "Defendants") development and sale of GenStrips: blood glucose test strips intended for use in Plaintiffs' LifeScan, Inc. and LifeScan Scotland, Ltd.'s (collectively, "Plaintiffs") OneTouch Ultra test meter. Plaintiffs allege that Defendants' test strips infringe their U.S. Patent Nos. 6,241,862 ("the '862 patent") and 5,708,247 ("the '247 patent") and that Defendants indirectly infringe Plaintiffs' U.S. Patent No. 7,250,105 ("the '105 patent"). The court previously stayed this action as to the '862 and '247 patents. Dkt. No. 245.

Presently before the court is Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 176) and Defendants' Motion to Dismiss as to Count 3 of the First Amended Complaint (Dkt. No. 174). The court held a hearing on Plaintiffs' Motion for Preliminary Injunction on February 21, 2013 and took Defendants' Motion to Dismiss under submission. Having reviewed the parties' briefing and

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1  heard the parties' arguments, the court GRANTS Plaintiffs' Motion for Preliminary Injunction and

2  DENIES Defendants' Motion to Dismiss for the reasons set forth below.

3  **1.      TECHNOLOGY BACKGROUND**

4        The parties are competitors in the blood glucose monitoring systems industry.  Since 2000,

5  Plaintiffs have marketed and sold the OneTouch Ultra System, a glucose monitoring system used

6  by patients with diabetes.  <u>See</u> Pl. Mtn. for Prelim. Inj.  3-4, Dkt. No. 176; Def. Opp. 2; Dkt. No.

7  203.  Plaintiffs are the market leader in glucose monitoring systems, and generate approximately $1

8  billion in sales annually.  Dkt. No. 203 at 2.  The system is composed of both a meter and

9  disposable test strips. Dkt. No. 176 at 3.  To use the system, a patient places a disposable test strip

10  in the meter, draws a small drop of blood using a lancet, and places the blood on the test strip.  Dkt.

11  No. 176 at 3-4.  The meter then determines the glucose level in the blood by measuring the

12  electrical current produced when an electrochemical reaction is triggered in the strip by the

13  glucose.  <u>Id.</u> at 4.

14        Plaintiffs' competitive advantage appears to be in its DoubleSure Technology, which is the

15  subject of the '105 patent.  <u>Id.</u>  DoubleSure Technology is a method designed to improve the

16  reliability and accuracy of glucose measurements.  <u>Id.</u>  It uses a self-testing strip design, using

17  multiple sensors in a downstream configuration.  <u>Id.</u> at 6.   Figure 2 depicts the test strip design:



18
19
20
21
22
23
24
25

26        A drop of blood applied to the top of the test strip flows downstream by capillary action.

27  <u>Id.</u>  The test strip has two working sensors (6b and 8b), with one sensor downstream from the

28

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

other.  Id.  This design ensures that the first sensor is completely covered in blood before the second sensor is reached, allowing for more accurate results.  Id.  The currents are measured at each sensor, and if the values are within a pre-determined range of one another, the reading is accurate.  Id.  If the difference in values is outside of the acceptable range, the reading may not be accurate and the test strip can be discarded.  Id. at 6-7.

Defendants' GenStrips are nearly identical to Plaintiffs' test strips, and are designed specifically to work with the OneTouch Ultra meter.  See id. at 5.  GenStrips received FDA approval in January of this year, but are not approved for use in any device other than the OneTouch Ultra meter.  Id.  While GenStrips have not been on the market for the majority of this litigation, Defendants confirmed at the preliminary injunction hearing that their product is now available for purchase.  Prelim. Inj. Hr'g Tr. (Rough) 80:20-21 (Feb. 21, 2013).

## 2.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### 2.1 Legal Standard

Because this motion for preliminary injunction arises in the context of a patent infringement action, the court will apply Federal Circuit law.  See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1450, n. 12 (Fed. Cir. 1988).  The Federal Circuit requires the court to consider four factors of "universal applicability" in determining whether a grant of a preliminary injunction is appropriate: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tips in the plaintiff's favor; and (4) the injunction is in the public interest. Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375-76 (Fed. Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)).  Each of these four factors must be weighed and assessed against the others and against the form and magnitude of the relief requested. Hybritech, 849 F.2d at 1451.

### 2.2 Likelihood of Success on the Merits

In a patent infringement case, "reasonable likelihood of success on the merits" means that a patentee must show (1) it will likely prove infringement; and (2) its infringement claim will likely withstand challenges to the patent's validity and enforceability.  Purdue Pharma L.P. v. Boehringer

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

1  Ingelheim Gmbh, 237 F.3d 1359, 1363 (Fed. Cir. 2001).   Even at this stage, the court must

2  consider the evidence in light of the presumptions and burdens that will apply at trial. Titan Tire,

3  566 F.3d at 1376.

4         A patent is presumed valid at trial. 35 U.S.C. § 282.  Thus, the alleged infringer bears the

5  burden of proving an affirmative defense of invalidity by clear and convincing evidence. Titan

6  Tire, 566 F.3d at 1376.  If the accused infringer successfully meets its burden, the plaintiff then

7  must come forward with contrary evidence sufficient to overcome the accused infringer's showing.

8  Id.    At the preliminary injunction stage, a patent is also presumed to be valid.  Similarly, the

9  accused infringer bears the burden to present evidence of invalidity.  However, unlike at trial, the

10  accused infringer need only raise a "substantial question" regarding validity.  Sciele Pharma Inc. v.

11  Lupin Ltd., 684 F.3d 1253, 1263 (Fed. Cir. 2012); Abbot Labs. v. Sandoz, Inc., 544 F.3d 1341,

12  1364 (Fed. Cir. 2008); Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1359 (Fed.

13  Cir. 2001) (finding that the defendants' burden to raise a "substantial question" did not equate to

14  the "clear and convincing" standard required at trial, but instead could be met by showing

15  "vulnerability").  Notwithstanding the accused infringer's duty to bring forward evidence of

16  invalidity, the ultimate burden remains on the plaintiff to show that the alleged infringer's defense

17  "lacks substantial merit," and that plaintiff is likely to succeed at trial despite the validity

18  challenge.  Titan Tire, 566 F.3d at 1377 (quoting New England Braiding Co. v. A.W. Chesterton

19  Co., 970 F.2d 878, 883 (Fed. Cir. 1992)).  In determining the likelihood of success on the validity

20  issue, the court must "weigh the evidence both for and against validity that is available at this

21  preliminary injunction stage…[t]hen…if the [court] concludes there is a 'substantial question'

22  concerning the validity of the patent, meaning that the alleged infringer has presented an invalidity

23  defense that the patentee has not shown lacks substantial merit, it necessarily follows that the

24  patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity

25  issue." Id.

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

## 2.2.1 Patent Exhaustion

Before reaching the issues of infringement and invalidity, the court must first consider whether Plaintiffs are likely to show that the '105 patent has not been exhausted. "The declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention." Univis Lens Co. v. United States, 316 U.S. 241, 250 (1942) (citing U.S. Const. Art. I, § 8, cl. 8). To strike the proper balance between the public's interest in innovation and an inventor's need for remuneration, the law extends to patentees a monopoly for a limited period of time, during which the patentee maintains the exclusive "right to make, use, and sell" the invention. See Bauer & Cie v. O'Donnell, 229 U.S. 1, 10 (1913). However, that monopoly is not unlimited. Once a patentee sells the patented invention in whole or, under certain circumstances, in part, the monopoly is exhausted. Univis, 316 U.S. at 249. This principle of patent exhaustion is also called the first sale doctrine. See Static Control Components, Inc. v. Lexmark Int'l Inc., 615 F.Supp.2d 575, 578 (E.D. Ky. 2009).

As the Supreme Court recently articulated, the first sale doctrine provides that "the initial authorized sale of a patented item terminates all patent rights to that item." Quanta Comp., Inc. v. LG Electronics, Inc., 553 U.S. 617, 625 (2008). In operation, the doctrine "prohibits patent holders from selling a patented article and then 'invoking patent law to control postsale use of the article.'" Excelstor Tech., Inc. v. Papst Licensing GmbH & Co. KG, 541 F.3d 1373, 1376 (Fed. Cir. 2008) (citing Quanta, 553 U.S. at 638). Because application of the doctrine extinguishes a patentee's monopoly right over the patented item, "[e]xhaustion is triggered only by a sale authorized by the patent holder." Quanta, 553 U.S. at 636.

The parties dispute whether an "authorized sale" has occurred such that the '105 patent could be deemed exhausted. Plaintiffs first distribute their OneTouch Ultra products either by (1) having doctors distribute a free OneTouch Ultra kit, comprised of a meter and 10 test strips, to diabetic patients, or (2) selling the OneTouch Ultra meter alone at a reduced price. Defendants contend that under either distribution scheme, Plaintiffs have transferred ownership of their

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

patented invention, thus extinguishing their right to control consumers' use of the product. Plaintiffs, however, contend that because they have not received their "reward" for the free kits and because the meter alone does not "substantially embody" the inventive aspects of the '105 patent, exhaustion cannot apply.

### 2.2.1.1 Free Distribution of OneTouch Ultra Kits

First, the court must consider whether distributing a patented article for free constitutes an "authorized sale." Plaintiffs argue that their free distribution scheme cannot trigger the first sale doctrine because they have not received their "reward" for the patented article. Defendant contends that a free distribution triggers the first sale doctrine because it is the transfer of ownership, not the adequacy of Plaintiff's remuneration, which creates an "authorized sale."

The question presented by the parties—whether it is the transfer of title and ownership or rather the purchase and sale of a patented article that triggers the first sale doctrine—has not been directly addressed by courts of higher authority. In most cases, courts need not consider this distinction because the transfer of ownership is typically accomplished through a traditional sale or licensing agreement. However, in a case such as this where the patented article primarily enters the stream of commerce through a free distribution system, the distinction is a crucial one that must be examined.

In 1859, the Supreme Court considered the question of whether patent exhaustion applied during an extended patent term. Chaffee v. The Boston Belting Co., 63 U.S. 217 (1859). In doing so, the Court reiterated the principles of patent exhaustion, holding that

> [w]hen the patented machine rightfully passes to the hands of the purchaser from the patentee, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly…By a valid sale and purchase, the patented machine becomes the private individual property of the purchaser, and is no longer protected by the laws of the United States, but by the laws of the State in which it is situated.

> Id. at 223.

However, the court went on to declare that

6

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

it is obvious[] that if a person legally acquires a title to that which is the subject of letters

patent, he may continue to use it…as he pleases, in the same manner as if dealing with

property of any other kind."

Id.

Because the record did not reflect that the defendants had legally licensed the machine at issue, the

Court found them to be "naked infringers" who could not be saved by the principles of patent

exhaustion. Id. at 224.

The language used by the Chafee Court in describing the point at which "the machine is no

longer within the limits of the monopoly" would seem to support either party's argument in the

present case. On the one hand, the Court looked to a "valid sale and purchase" to trigger

exhaustion, whereas on the other, the Court pointed to a person's "legally acquir[ing] a title" as the

exhaustive moment. A close reading of the opinion would seem to suggest that the way in which a

person would "legally acquire[] title" would be through a "valid sale and purchase;" however, the

Court did not so explicitly state the principle, leaving the door open for arguments such as

Defendants' here.

As the Supreme Court's exhaustion jurisprudence evolved, the Court did not directly

address the difference between a "valid sale and purchase" and "legally acquir[ing] a title;"

however, the distinctions it has drawn in other areas prove useful to the analysis. In Univis, the

Court considered the question of whether the first sale doctrine applied when the patentee, a lens

company, sold its patented lens blanks to a wholesaler, who then was required to grind the blanks

down to finish them using a standard process cited in the patentee's method patents. 316 U.S. 241

(1942). Because the lens blanks themselves "embodie[d] essential features of [the] patented

invention" the court determined that their sale also embodied the "reward" to which the patentee

was entitled. 316 U.S. at 251. The Court explained that "the purpose of the patent law is fulfilled

with respect to any particular article when the patentee has received his reward for the use of his

invention by the sale of the article" and that beyond that sale, the patentee had no further right to

control use of the article. Id.

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    On its face, the <u>Univis</u> opinion suggests that it is a traditional sale of a patented invention

2  that triggers exhaustion.  However, the same day the Court issued its <u>Univis</u> decision, it also issued

3  an order in <u>United States v. Masonite Corp.</u>, which steered the exhaustion inquiry away from a

4  focus on traditional sales.  316 U.S. 265 (1942).  According to the <u>Masonite</u> Court, the form of the

5  sale of the patented article has no impact on the application of exhaustion; rather, the test simply is

6  "whether or not there has been such a disposition of the article that it may fairly be said that the

7  patentee has received his reward for the use of the article."  316 U.S. at 278 (finding exhaustion

8  where patentee "disposed" of the patented product to a del credere agent with which patentee had

9  "no intimate relationship" and with whom patentee competed, because the arrangement, without

10  more, enlarged the patentee's privilege to fix prices in violation of the Sherman Act).  The inquiry

11  thus shifted from whether a "valid sale and purchase" had occurred to whether the patentee had

12  received his "reward" in any form.  After <u>Univis</u> and <u>Masonite</u>, the Court did not develop the

13  "reward" inquiry further.  Nor did it address any major patent exhaustion issue until 2008, when it

14  issued its opinion in <u>Quanta</u>.   In that case, which will be discussed in detail in the following

15  section, the Court acknowledged that an "authorized sale" was required to trigger the first sale

16  doctrine, but did not address the issue of reward in any substantial detail.

17    In the years since <u>Univis</u>, the Federal Circuit has shed some light on what forms of

18  "reward" trigger exhaustion.  In 1993, the court considered the question of whether a licensed

19  seller of a patented product must own the patent rights to that product in order for there to be a sale

20  sufficient to trigger exhaustion.  <u>Intel Corp. v. ULSI Sys. Tech., Inc.</u>, 995 F.2d 1556, 1569-70 (Fed.

21  Cir. 1993).  In holding that the patentee-assignee's rights terminated with the sale of the patented

22  product by a licensee acting within the scope of its license, the court noted that

23    [w]hile Intel may not in retrospect be pleased with the deal that it made permitting HP to

24    make unrestricted sales, it nevertheless granted HP that right in 1983, presumably for

25    consideration it believed to be of value at that time. It cannot now renege on that grant to

26    avoid its consequences.

27    <u>Id.</u> at 1569.

28

8

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

Later, in <u>TransCore, LP v. Electronic Transaction Consultants Corp.</u>, the court found that a settlement agreement containing a broad covenant not to sue for future infringement constituted an "authorized sale" for purposes of patent exhaustion under <u>Quanta</u>. 563 F.3d 1271, 1276-77 (Fed. Cir. 2009). In that case, the plaintiff had received $4.5 million from a competitor in exchange for an unconditional covenant not to sue and a release of all existing claims. When the plaintiff later sued a customer of the competitor for infringement, the Federal Circuit upheld the district court's finding that the plaintiff's patents had been exhausted by the settlement agreement.

More recently, the court has examined the issue in the context of patented seeds. In <u>Monsanto Co. v. Bowman</u>, the court found that patent exhaustion may apply to the original seeds sold, but not to any subsequent generation of those seeds after they have been planted. 657 F.3d 1341, 1347-48 (Fed. Cir. 2011), <u>cert granted</u> 133 S. Ct. 420 (Oct. 5, 2012). In so finding, the court explained that the subsequent generation of seeds constitutes a "newly infringing article" for which the patentee had not received a reward. <u>Id.</u>

The common theme running through this line of cases is consideration. In each case where exhaustion has been found, the transfer of ownership of the patented article was accomplished by some bargained-for exchange: a traditional sale, as in <u>Univis</u>; a licensing agreement, as in <u>Intel</u>; the disposition of an article with a competitor in exchange for higher sale prices, as in <u>Masonite</u>; or a covenant not to sue in exchange for a cash settlement, as in <u>TransCore</u>. In contrast, exhaustion has not been found when the patentee has not received any consideration in exchange for the patented article, as with the second generation seeds in <u>Monsanto</u>.

In this case, when Plaintiffs distribute their OneTouch Ultra kits for free, they receive no remuneration at the moment they part with their patented invention. Rather, Plaintiffs distribute the kits in consideration of patients' anticipated future repeat purchases of Plaintiffs' disposable test strips. Thus, at the moment of disposition, Plaintiffs have not received their reward for their invention. At the hearing, Defendants argued that Plaintiffs receive their reward for the '105 invention within two months of the free distribution of the meters. Hr'g Tr. (Rough) 88:21-24. Such argument belies any suggestion by Defendants that Plaintiffs receive their reward when they

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

distributes the kits for free—i.e., the parties essentially agree that the "reward" comes in Plaintiffs' repeated sale of disposable test strips to diabetic patients. Because the Supreme Court and the Federal Circuit have emphasized that a patentee's receiving of some reward for his or her invention triggers exhaustion, and because Plaintiffs here do not receive any reward at the time of distribution, Plaintiffs can likely show that patent exhaustion is not triggered by the free distribution of its OneTouch Ultra kits.

### 2.2.1.2 Plaintiffs' Sale of Meters Alone at a Reduced Price

Having determined that the free distribution of OneTouch Ultra kits likely does not trigger patent exhaustion, the court must now consider whether the sale of the OneTouch Ultra meter alone at a reduced price is sufficient to exhaust the '105 patent. The '105 patent is a method patent that requires both a meter and a test strip for an individual to practice it. As such, the sale of the meter by itself does not necessarily convey the entire invention of the '105 patent to the purchaser, casting the applicability of exhaustion into doubt.

The Supreme Court recently addressed the application of patent exhaustion to method patents in Quanta. In that case, LGE licensed its computer technology patents to Intel, authorizing Intel to manufacture and sell microprocessors and chipsets under the patents. In a separate agreement, LGE required Intel to provide its customers with a written notice that the license between LGE and Intel did not extend to any product made by combining an Intel product with a non-Intel product. Quanta purchased microprocessors and chipsets from Intel and placed them in computers manufactured with non-Intel parts. LGE sued Quanta, asserting that the combination infringed its patents. See Quanta, 553 U.S. at 623-24.

The district court found, and the Federal Circuit affirmed, that patent exhaustion did not apply to method patents and thus that LGE could assert its patent rights against Quanta. See LG Elec., Inc. v. Bizcom Elec., Inc., 453 F.3d 1364, 1370 (Fed. Cir. 2006). The Supreme Court reversed, holding that patent exhaustion does in fact apply to method patents, including the patents at issue in the case. 553 U.S. at 628, 638. In so holding, the Court made clear that when a component of a patented system is sold but is required to be combined with additional components

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

after the sale in order to fully practice the patented method, the sale of the component only triggers patent exhaustion when the component "substantially embod[ies]" the patents-in-suit. 553 U.S. at 621, 633. According to the Quanta Court, an item "substantially embodies" the patent when it covers the "essential, or inventive, feature" of the patent and when the item's only reasonable and intended use is to practice the patent. Id. at 632-33.

In Quanta, LGE's patents were found to be exhausted because "[e]verything inventive about each patent [was] embodied in the Intel Products" and "the only step necessary to practice the patent [was] the application of common processes or the addition of standard parts." 553 U.S. at 633. In making this determination, the Court relied on its prior reasoning in Univis, which found exhaustion in part because the item sold "embodie[d] essential features of [the] patented invention" whereas the finishing process required to practice the patent was a standard process barely mentioned in the patents-in-suit and thus only "incidental to the invention." 553 U.S. at 632-33 (quoting Univis, 316 U.S. at 250-51). Similarly here, to determine whether the '105 patent has been exhausted by the sale of Plaintiffs' OneTouch Ultra Meter alone, the court must determine whether that meter embodies the "inventive" feature of the '105 patent, and whether the OneTouch Ultra test strips constitute anything more than "standard parts."

The '105 patent specification describes what the inventor perceived as a problem in the art relating to the accuracy of blood glucose measuring devices: inaccurate readings caused by insufficient blood coverage of the working sensor part or by manufacturing defects. '105 patent 1:39-41; 55-58. By teaching two identical working sensor parts configured in such a way to ensure that the first sensor is completely covered in blood before the second sensor is reached, the '105 patent allows for the measurements from the two sensors to be compared. If the results from the two sensors are too disparate, the '105 patent teaches that an error code should appear alerting the user to discard the test strip and try again. See '105 patent, 2:27-30. In this way, the '105 patent's invention is self-testing for accuracy. This solution addresses the problem the inventor identified in the art while still keeping the cost of the disposable test strip low. Id. at 1:21-22, 32-38.

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

The specification and claims make clear that at the very least both a measuring device and two working sensor parts are required to practice the invention. Particularly, Claim 1 calls for:

a measuring device said device comprising:

a first working sensor part for generating charge carriers in proportion to the concentration of said substance in the sample liquid;

a second working sensor part downstream from said first working sensor part also for generating charge carriers in proportion to the concentration of said substance in the sample liquid wherein said first and second working sensor parts are arranged such that, in the absence of an error condition, the quantity of said charge carriers generated by said first working sensors part are substantially identical to the quantity of said charge carriers generated by said second working sensor part; and

a reference sensor part upstream from said first and second working sensor parts which reference sensor part is a common reference for both the first and second working sensor parts, said reference sensor part and said first and second working sensor parts being arranged such that the sample liquid is constrained to flow substantially unidirectionally across said reference sensor part and said first and second working sensor parts; wherein said first and second working sensor parts and said reference sensor part are provided on a disposable test strip

('105 patent 6:55-711)

i.e., the two working sensor parts, as well as:

applying the sample liquid to said measuring device;

measuring an electric current at each working sensor part proportional to the concentration of said substance in the sample liquid;

comparing the electric current from each of the working sensor parts to establish a difference parameter; and

giving an indication of an error if said difference parameter is greater than a predetermined

12

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

1    threshold.

2        ('105 patent 7:12-8:5)

3    i.e., a measuring device—here, a meter.

4        In allowing the '105 patent to issue, the patent examiner highlighted the differences in

5    Plaintiffs' working sensor parts from the sensors present in the prior art.  The examiner noted that,

6    unlike the prior art, Plaintiffs' two working sensors were identical in size and composition,

7    allowing the charge carriers from each working sensor to be compared.  Supplemental Declaration

8    of Mark Meyerhoff ("Meyerhoff Supp. Decl.") Ex. 18 at 8-9.  Thus, the patent examiner

9    considered the sensors to be an important component of the '105 patent's invention.

10        While "some or all of the sensor parts may be provided as part of an integrated device," the

11   specification sets forth a preferred embodiment in which the working sensor parts are provided in a

12   downstream configuration on a "removable test member," described in Claim 1 as a "disposable

13   test strip."  '105 patent 2:57-59; 7:11.  Tellingly, the '105 patent itself devotes much of the

14   specification and most of the claim language to describing the sensor parts contained in the

15   disposable test strips and the design of the strips themselves.  Figures 1-7 of the '105 patent

16   highlight various elements of the proposed test strip, but no figure relates to the meter or any other

17   measuring device.  Similarly, the majority of the specification and claim language is devoted to

18   describing the arrangement, composition, and operation of the working sensor parts.  By contrast,

19   the specification and claims devote little space to describing the meter.

20        As evidenced by the patent examiner's reasoning and the depth of treatment the patent

21   specification and claims afford to the test strips, the strips are likely more than "incidental" to the

22   '105 patent's invention.  See Quanta, 553 U.S. at 633.  Defendants argue that under Quanta the test

23   strips must amount to a "unique feature of the patented system" in order to avoid exhaustion. Dkt.

24   No. 203 at 10.  Plaintiffs press for a narrower reading of Quanta, which would prevent exhaustion

25   from applying if the strips constitute anything more than a "standard component" used to practice

26   the '105 patent.  Dkt. No. 176 at 13.  The court need not consider these competing interpretations

27   because under either reading of Quanta, the meters alone do not "substantially embody" the '105

28                                                    13

United States District Court
For the Northern District of California

1   patent.  As the examiner noted, the particular design and arrangement of the working sensors on

2   Plaintiffs' test strips contribute substantially to the novelty of the '105 patent's method.

3   Accordingly, the strips themselves are more than mere "standard components" and moreover likely

4   constitute a "unique feature of the patented system."  Because the strips are significant to the

5   novelty of the '105 invention, the meters alone simply cannot "all but completely practice" or

6   embody the "essential" or "inventive" feature of the '105 patent as required by Quanta.  553 U.S. at

7   632-33.

8        Having found that Plaintiffs' OneTouch Ultra meters likely do not embody the inventive

9   feature of the '105 patent, the court need not reach the parties' arguments regarding the reasonable

10  non-infringing uses of the OneTouch Ultra meter.  The Quanta court found exhaustion because

11  LGE's chipsets and microprocessors substantially embodied the patents-in-suit, as evidenced by

12  the facts that the products had no reasonable non-infringing uses and embodied the essential

13  features of the patents-in-suit.  553 U.S. at 631-32.  However the court does not consider these

14  bases to be completely separate grounds on which to find substantial embodiment and

15  consequently, exhaustion.  Plaintiffs' showing that they likely have not sold their invention by

16  selling the OneTouch Meter alone is sufficient to demonstrate a likelihood of success on

17  exhaustion.

18              **2.2.1.3 Implied License, Sherman Act, and Breach of**

19                            **Contract Arguments**

20       Because the court has found that patent exhaustion likely does not apply to the free

21  distribution of Plaintiffs' OneTouch Ultra kits or the sale of Plaintiffs' meters alone, Defendants'

22  Sherman Act and contract arguments are of no moment.  Such arguments anticipate Plaintiffs'

23  response should the court find exhaustion, but add nothing to the discussion in the event Plaintiffs

24  prevail on that issue.   Plaintiffs' implied license argument is similarly irrelevant because, though

25  such an argument could be pertinent given that the court has found a likelihood of success on

26  exhaustion, Defendants have not raised an implied license defense.

27

28

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

### 2.2.2   Indirect Infringement

In order to show a likelihood of success on the question of Defendants' inducing and contributory infringement, Plaintiffs must first show a likelihood of success in proving that consumers directly infringe the '105 patent when using Defendants' GenStrips in OneTouch Ultra meters. Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 526 (1972) ("if there is no (direct) infringement of a patent there can be no contributory infringer") (citation omitted); Akamai Tech. Inc. v. Limelight Networks Inc., 692 F.3d 1301, 1308 (Fed. Cir. 2012) ("An important limitation on the scope of induced infringement is that inducement gives rise to liability only if the inducement leads to actual infringement."). To show direct infringement, Plaintiffs must demonstrate that every step of the '105 patent's method is practiced when consumers use GenStrips in the OneTouch Ultra meter. See Meyer Intellectual Prop. Ltd. v. Bodum, Inc., 690 F.3d 1354, 1366 (Fed. Cir. 2012). Because the parties do not dispute the inducing or contributory conduct of Defendant, the court must only determine the likelihood of success on the direct infringement question.

Defendants here do not stake out the typical litigation position of accused infringers vehemently denying infringement on the basis of differences between their product and the patented invention. In fact, the parties all but concede that Defendants' GenStrips are identical at least in configuration and operation to Plaintiffs' strips. By extension, the parties appear to agree that, when used by a consumer in a OneTouch Ultra meter, Defendants' GenStrips would enable that consumer to practice the '105 invention in the same manner as Plaintiffs' test strips. Having no sincere argument as to notable differences between GenStrips and Plaintiffs' strips, Defendants instead urge the court to find that direct infringement is impossible, because neither GenStrips nor Plaintiffs' strips are capable of practicing the '105 patent as drafted.

Defendants hinge this unusual argument on the meaning of "proportional" in Claim 1 of the '105 patent. Particularly, Defendants urge the court to accept that the '105 patent uses science that is "simply incorrect," requiring the electric current itself, rather than the measurement of that

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

current through the manipulation of the current data, to be proportional to the amount of glucose in the blood. Wang Decl. ¶ 28. If that interpretation is correct, then neither GenStrips nor Plaintiffs' OneTouch strips can satisfy the '105 patent limitations because, when using those devices, what is actually proportional is the manipulated measurement of the current, while the current itself is merely "correlated" to the glucose content in the blood. See Declaration of Dr. Joseph Wang ("Wang Decl") ¶ 26, Dkt. No. 206.

Plaintiffs contend that this argument requires a "strained and unnatural" reading of proportionality as it is understood in the field of electrochemistry. Hr'g Tr. (Rough) 22:6-7. According to Plaintiffs, the art's understanding of proportionality is not that of a mathematical fixed ratio of glucose to current as suggested by Defendants. Instead, proportionality is a calculation that relies on a linear equation adjusted for background current, environmental factors, and temperature. Meyerhoff Supp. Decl. ¶¶ 149-51.

Defendants themselves appear to rely on this understanding of proportionality when convenient. For instance, in their first obviousness argument, Defendants explain to the court that the Winarta '229 patent uses proportionality in the same way as Plaintiffs' '105 patent. Wang Decl. ¶ 35. Thus Defendants are asking this court to view not only Plaintiffs' patent, but also other art references, as employing "incorrect science." Additionally, Defendants appear to rely on the "incorrect" proportionality interpretation in their dealings with the FDA. Defendants' Instructions for Use ("IFU") state in relevant part: "Glucose in blood combines with an enzyme in the test strip. This produces an electric current in the Meter in proportion to the glucose level." Meyerhoff Supp. Decl. Ex. 2. Defendants make much of the inclusion of the chemical reaction in this statement, but their argument is of no moment. Though it is clear that a chemical reaction produces the electric current, Defendants nevertheless have stated to the FDA that that current is "in proportion" to the glucose level in the blood.

Having illustrated the substantial parity between their and Defendants' test strips, Plaintiffs have demonstrated a likelihood of success on the question of infringement. The court is not persuaded that Defendants' reading of proportionality in the '105 patent is enough to generate a

16

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

"substantial question" as to infringement.  Such an understanding seems contorted and divorced from the art, and even contrary to Defendants' own usage of the term.  Accordingly, Plaintiffs are likely to succeed on the ultimate question of infringement.

### 2.2.3  Invalidity

Defendants assert an affirmative defense of invalidity under 35 U.S.C. §§ 101 and 112 for lack of utility and enablement and under 35 U.S.C. § 103 for obviousness.  At this stage in the proceedings, the court must weigh both parties' evidence to determine whether a substantial question exists as to invalidity.  Titan Tire, 566 F.3d at 1377.  As discussed in the previous section, Plaintiffs have shown a likelihood of success on the question of infringement, including on the question of the interpretation of proportionality in the '105 patent.  Because Defendants rely on the same argument to support their §§ 101 and 112 defense as they do to support their assertion of non-infringement, the court finds that Plaintiffs have similarly shown a likelihood of overcoming Defendants' validity challenge on those grounds.  The court therefore must only consider whether on balance, the evidence regarding obviousness is such that a substantial question exists as to the '105 patent's validity.

A patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  The determination of obviousness is "a question of law based on underlying findings of fact."  In re Kubin, 561 F.3d 1351, 1355 (Fed. Cir. 2009).  The Supreme Court has instructed courts to address the question of obviousness against the "background" of three inquiries: 1) the scope and content of the prior art; 2) differences between the prior art and the claims at issue; and 3) the level of ordinary skill in the art.  Graham v. John Deere Co., 383 U.S. 1, 17 (1966).  Courts must also consider "secondary considerations" that may be relevant to obviousness, such as "commercial success" and "long felt but unsolved needs."  Id. Additionally, obviousness can only be found when the prior art discloses all limitations of the

17

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

claim or claims.  See CFMT, Inc. v. Yieldup Int'l Corp., 349 F.3d 1333, 1342 (2003) (citing In re Royka, 490 F.2d 981, 985 (CCPA 1974)).

In this case, Claim 3, which Defendants argue is obvious, depends from Claim 1 of the '105 patent.  '105 patent 8:9.  Thus in order for Claim 3 to be found obvious, the limitations of both Claim 1 and Claim 3 must be disclosed by the prior art.  Defendants have come forward with eighteen separate obviousness grounds, which they contend encompass every element of Claims 1 and 3.   Each ground relies on some combination of ten prior art references, and each ground relies on either Winarta '229 or Nankai '420 as a primary reference.  The thrust of these arguments is that the '105 patent is obvious because prior art discloses, most importantly, the elements of employing a disposable test strip containing multiple sensors, positioning the sensors in a downstream configuration, taking multiple measurements, comparing the measurements to establish a difference parameter, and presenting an error code if the difference is outside a predetermined range, and because the combination of these elements yields nothing more than a predictable result. See KSR Intern. Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007).

### 2.2.3.1 Defendants' Prior Art References

The individual references and the parties' principal arguments as to each are as follows:

**Winarta '229 (U.S. Patent No. 6,258,229)**

Winarta '229 purports to solve the problem in the prior art of requiring too much test sample from patients, who generally are required to test their levels several times a day and experience much pain and inconvenience in obtaining the required test sample volume.  Winarta '229 patent 3:14-21. When patients produce insufficient sample volume, the resultant readings can be inaccurate.  To address this and other concerns, Winarta teaches the use of a reference electrode, a working electrode, and a pseudo-working electrode on a disposable test strip.  See id. at 4:12-15. The pseudo-working electrode is positioned downstream from the reference and working electrodes.  Once the sample liquid hits the pseudo-working electrode, the current produced "triggers the reading meter to start the measurement and analyte concentration determination process," "obviat[ing] reliability and accuracy problems due to an insufficient sample size." Id. at

18

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    5:63-6:1. Winarta '229 was not considered by the examiner, but Plaintiffs contend that the

2    examiner was aware of it because he considered the Winarta '451 patent, which dealt with similar

3    subject matter and was filed the same day as Winarta '229.

4           Defendants contend that Winarta discloses a test strip that covers every feature of the

5    "disposable test strip" component of the measuring device of Claim 1 of the '105 patent, including

6    multiple sensors and the downstream configuration. Dkt. No. 203 at 23. Because Winarta

7    provides these elements, Defendants suggest that "the test strip of Winarta ('229) is capable of

8    taking multiple measurements." Wang Decl. ¶ 35. Plaintiffs argue that such an interpretation is a

9    stretch because Winarta would require "significant design modifications—which it does not

10   advocate and which are contrary to its teaching—before it would actually be 'capable' of the

11   multiple measurements described by the '105 patent." Pl. Reply Br. 15, Dkt. No. 215. The

12   particular design modifications at issue would involve adjusting the pseudo-working electrode,

13   which per Winarta is smaller than the working sensor and does not measure glucose, into a

14   working sensor of the same size as the first working sensor. Such significant changes, according to

15   Plaintiffs, would preclude a finding that Winarta renders obvious the comparing of glucose

16   measurements at two sensor parts, or providing an error message based on any comparison.

17          **Nankai '420 (U.S. Patent No. 5,120,420)**

18          Nankai '420 also addresses the issue of accuracy in measurement, teaching that higher

19   accuracy can be achieved by "providing a plurality of electrode systems for the same sensor and

20   obtaining a mean value of the response levels." Nankai '420 patent 8:42-46. Nankai's solution

21   teaches multiple working sensor parts, the readings from which can be averaged to increase

22   precision. The examiner considered Nankai '420 in granting the '105 patent.

23          Defendants argue that Nankai renders Plaintiffs' test strips obvious because it contains

24   every element of the test strip, albeit in a different configuration. Dkt. No. 203. at 27. Plaintiffs

25   argue that Nankai did not identify the problems of insufficient blood fill or manufacturing defects,

26   and that Nankai's solution of arranging multiple working electrodes parallel to each other and

27   averaging the result would not address these problems. Rather than teaching a downstream

28

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

configuration, Nankai teaches placing the working electrodes parallel to one another, arranged such that the sample liquid reaches the reference sensor last.  Nankai '420 patent Figs. 12, 13.  However, Nankai does state that other arrangements are possible.  Id. at 8:47-52.  Plaintiffs also argue that Nankai teaches nothing more than averaging the results of the multiple measurements to provide a more accurate reading, i.e. that Nankai does not teach comparing results from multiple tests and providing an error indication if the difference between the measurements is out of range.  Instead, Nankai's solution would "simply mix good data with bad."  Dkt. No. 215 at 17.

### Fujiwara '441 (U.S. Patent No. 6,004,441)

Fujiwara '441 teaches measuring the current after a predetermined time in order to allow the glucose to oxidize.  Wang Decl. ¶ 96.  That patent also teaches multiple sensors, but only deploys one sensor as a working sensor part.  The examiner considered the Fujiwara '441 patent in granting the '105 patent, and distinguished it stating "[a]lthough the sensor parts of the biosensor of Fujiwara could be used as working sensor pars [sic] and a reference sensor part as claimed Fujiwara only uses the middle sensor part, electrode 4, as a working sensor part, and the outer sensor parts, electrodes 5, as counter (counter/reference) sensor parts."  Meyerhoff Supp. Decl. Ex. 18 at 8.  Defendants argue that Fujiwara '441 renders obvious the use of a pause between the application of the sample liquid and the measuring of the current.  Plaintiffs contend that Fujiwara's teachings were common knowledge to one of skill in the art, but that Fujiwara would not lead one to construct the strip in the manner taught by the '105 patent.

### Yee '256 (U.S. Patent No. 5,672,256)

Yee '256 teaches that the arrangement of electrodes does not affect their characteristics and that multiple measurements should be taken and averaged together to address errors caused by test strip construction.  Id. at ¶ 51, 83.  Yee also teaches that there is a range of errors that is impermissible, and thus Defendants argue that it would have been obvious to give the user an error indication.  Dkt. No. 203 at 25.  Plaintiffs contend that the use of an error message was common knowledge to one of skill in the art, but that Yee, like Fujiwara, would not lead one confronted with the problems identified by the '105 patent to construct the strip as it is claimed.

20

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

**Stewart '891 (U.S. Patent No. 6,540,891)**

Stewart '891 discloses that glucose meters used with disposable strips typically have electronic features designed to detect invalid results and report an error condition. Wang Decl. ¶ 87. Defendants use this reference to argue that Plaintiffs' showing of an error message would have been predictable. Plaintiffs acknowledge that this teaching would have been standard to someone of skill in the art, but again argue that Stewart '891 would not lead anyone to construct the design and methods claimed by the '105 patent. Meyerhoff Supp. Decl. ¶ 127.

**Say '752, Schulman '344, and Horii '998 (U.S. Patent Nos. 6,175,752; 5,791,344; and 5,004,998 )**

Say '752, Schulman '344, and Horii '998 all involve a separate but related art of continuous monitoring technology. These patents concern sensors that are implanted in the body for a period of days or weeks, then removed and replaced. See Say '752 patent 27:19-25. To address the problem of when to replace the sensor, the patents teach multiple working electrodes whose output signals can be compared to determine whether the sensor or sensors are working properly. Id. at 2:13-28. Both the Schulman '344 and the Horii '998 patents were considered by the examiner in granting the '105 patent. Defendants lean on these patents to suggest that comparing multiple measurements would have been obvious. Plaintiffs contend that these patents pertain to a non-analgous art that does not face the same problems of inadequate blood fill or manufacturing defects that the '105 patent solves, and that as such one of skill in the art would not have been lead to construct the '105 test strip as taught by the patent.[1]

**Khazanie and Lichten**

The Khazanie and Lichten textbooks are mathematics textbooks. Defendants rely on these books to argue that one of ordinary skill in the art would have known how to determine a "mean

---

[1] The court OVERRULES Defendants' Objection to Reply Evidence (Dkt. No. 228). While Defendants are correct in asserting that Plaintiffs had opportunity prior to their Reply brief to define a person of ordinary skill in the art, the court does not rely on the new definition contained in the Supplemental Declaration of Mark E. Meyerhoff. Similarly, the court has not relied on the Supplemental Declaration of Peter Menziuso.

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

deviation," a "standard deviation," or an "average duration" when averaging numbers. Plaintiffs contend that these sources are "background noise" to a person of skill in the art, but do not pertain to the problem addressed by or the solution contained in the '105 patent. Dkt. No. 215 at 19.

### 2.2.3.2 Plaintiffs' '714 Patent Application

In addition to the prior art references, Defendants also argue that the court should consider the USPTO's initial rejection of Plaintiffs' '714 patent application on obviousness-type, obviousness, and anticipation grounds and Plaintiffs' subsequent abandonment of the '714 patent application as evidence suggesting that the claims approved in the '105 patent are obvious. The '714 patent application sought to expand the coverage of the '105 patent. Using a transitive argument Defendants suggest that because the patent examiner found the claims of the '714 application to be patentably indistinguishable from the '105 patent claims, and because the examiner also found that the '714 application claims were not patentable based on prior art, that the '105 patent must also be invalid under the prior art. The court is not inclined to accept this argument at this stage in the proceedings. Initial rejections are quite common, and a company's decision to abandon a patent application may be made on any number of bases. Therefore, the court does not find that the USPTO's rejection of the '714 patent application or Plaintiffs' subsequent abandonment of that application generates a substantial question as to the validity of the '105 patent.

### 2.2.3.3 Obviousness Determination

The court finds that, on the whole, Plaintiffs have shown a likelihood of overcoming Defendants' obviousness challenges. Plaintiffs have rebutted Defendants' obviousness evidence with compelling evidence and argument showing that the patent examiner considered many of the references cited by Defendants, that one of skill in the art would not necessarily have had reason to combine the known elements, that the prior art does not cover each and every limitation of Claim 3, and that Defendants improperly used hindsight.

First, the court notes five of Defendants' references were considered by the patent examiner (Nankai '420, Horii '998, Yee '256, Schulman '344, and Fujiwara '441 ), and two references (Say

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

'752 and Stewart '891) are arguably cumulative of these references. Additionally, the examiner

considered Winarta '451, which involved related technology and was filed on the same day as

Winarta '229. The examiner ultimately issued the '105 patent over those references. See OSRAM

Sylvania, Inc. v. Am. Induction Tech., Inc., 701 F.3d 698, 705 (finding that "prior consideration of

a reference during prosecution may carry some weight" even when accused infringer does not bear

a heightened burden on validity).

Second, Defendants' combinations of references are not compelling because the art was not

concerned with the problems Plaintiffs addressed in the '105 patent. While accuracy of

measurement was a generally known issue, the Nankai '420 patent purported to solve it using the

mean of the sensor measurements. Similarly the issue of insufficient blood fill was touted as

solved by the Winarta '229 patent. Thus even assuming that the elements of multiple working

sensors of equal size, arranging those sensors in a downstream configuration, taking multiple

measurements, and comparing the measurements to determine error were known, the result of the

combination of those elements is not predictable. KSR, 550 U.S. at 418. Rather, the combination

produced a novel invention solving problems previously unidentified in the art. See Mintz v. Dietz

& Watson, Inc., 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("Often the inventive contribution lies in

defining the problem in a new revelatory way.")

Third, no combination of references presented by Defendants covers each and every

limitation of Claims 1 and 3. It seems that at best, each combination proposed by Defendants

demonstrates that the idea of using multiple sensors to take measurements that could be averaged

and deliver an error code was known in the art. But Defendants have not sufficiently demonstrated

that the idea of using two working sensors of identical size and composition, or comparing the

sensor readings in a way other than averaging them would have been obvious to a person of skill in

the art. Winarta '229 describes multiple sensors in a downstream configuration, but only one of

those sensors is truly a working sensor, and the sensors vary in size. Say '752 describes comparing

readings from a single sensor or from multiple sensors to determine inaccuracies, but does not

teach that the sensors be the same size, or even that multiple sensors must be used. Nankai '420

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

1   teaches the averaging of readings from multiple sensors, and arguably addresses the need for

2   sensors to be the same size, but again does not address the inaccuracies that can still result from the

3   averaging technique. The mathematics textbooks stand for the general proposition that one of skill

4   in the art would have known the method and use of standard deviations, but do not persuasively

5   suggest any reason one of skill in the art would have used standard deviations to solve the new

6   problems identified by the '105 patent.

7       Finally, both the combinations themselves and secondary considerations suggest that

8   Defendants have improperly used hindsight to construct these obviousness combinations.  See

9   Graham, 383 U.S. at 36.  Revealingly, Dr. Wang relies heavily on his presumption that the

10  invention is obvious in view of Winarta '229 because that patent's test strip would have been

11  "capable of taking multiple measurements."  However, as Plaintiffs have pointed out, Winarta

12  likely teaches away from the design modifications that would be required to accomplish the taking

13  of multiple measurements.  Defendants have not made clear why one of skill in the art would have

14  had reason to modify the Winarta invention and combine its teaching with those of the other

15  references.  Instead, such a finding suggests that Defendants' obviousness analysis improperly

16  started with the patented invention and then reached back to the prior art seeking out any reference

17  that touched on the individual elements comprising Plaintiffs' invention.  See Kinetic Concepts,

18  Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1368-69 (Fed. Cir. 2012) (reversing district court's

19  finding of obviousness in part because significant evidence of teaching away led to the conclusion

20  that "hindsight provides the only discernible reason to combine the prior art references").

21      Secondary considerations such as the commercial success of the OneTouch Ultra System

22  and Defendants' near-exact copying of Plaintiffs' test strip also suggest that the '105 patent's

23  method would not have been obvious to one having skill in the art.   These "objective indicia 'may

24  often be the most probative and cogent evidence of nonobviousness in the record.'" Mintz, 679

25  F.3d at 1378 (citing Ortho–McNeil Pharm. v. Mylan Labs., Inc., 520 F.3d 1358, 1365 (Fed. Cir.

26  2008); Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 306 (Fed. Cir. 1985)

27  (finding that objective indicia "may be the most pertinent, probative, and revealing evidence

28

                                        24

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

available to the decision maker in reaching a conclusion on the obviousness/nonobviousness issue."). Plaintiffs promote the "DoubleSure Technology" of the '105 patent on their OneTouch Ultra products' packaging and in their marketing, and their products have achieved commercial success. Moreover, Plaintiffs have become the market leader. That such success appears to be connected to the patented invention is strong evidence of nonobviousness. See Sciele Pharma, Inc. v. Lupin Ltd., 684 F.3d 1253, 1259 (Fed. Cir. 2012). Additionally, as discussed in Section 2.2.2, Defendants' test strips appear to be nearly identical to Plaintiffs' strips. This copying also constitutes strong evidence of non-obviousness. Windsurfing Int'l Inc. v. AMF, Inc., 782 F.2d 995, 1000 (Fed. Cir. 1986) ("copying the claimed invention, rather than one within the public domain, is indicative of non-obviousness").

### 2.2.4 Determination of Likelihood of Success on the Merits

The court finds that Plaintiffs have demonstrated a likelihood of success on the merits. Plaintiffs have demonstrated a likelihood of overcoming Defendants' patent exhaustion challenge because they do not receive their reward until months after they distribute the OneTouch Ultra system kits for free, and because the meters alone do not substantially embody the '105 patent. Additionally, Plaintiffs have shown that Defendants likely indirectly infringe the '105 patent. Defendants' test strips are nearly identical to Plaintiffs', and consumers likely practice the '105 patent when they use GenStrips in a OneTouch Ultra meter. Defendants have raised numerous obviousness arguments; however, Plaintiffs have come forward with sufficient evidence to suggest that no substantial question exists as to the '105 patent's validity. Therefore, this first factor weighs in favor of an injunction.

### 2.3 Irreparable Harm

Having found a likelihood of success on the merits, the court must now consider whether Plaintiffs will be irreparably harmed in the absence of an injunction. Until recently, a finding of likelihood of success on the merits entitled the movant to a presumption of irreparable harm. However, in 2011 the Federal Circuit made clear that, in light of eBay v. MercExchange L.L.C., the presumption no longer applies. Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148-

25

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

1   49 (Fed. Cir. 2011) (discussing 547 U.S. 388 (2006)).  The court noted that despite its abandoning

2   of the presumption, "it does not follow that courts should entirely ignore the fundamental nature of

3   patents as property rights granting the owner the right to exclude." Id.  Particularly relevant here,

4   the court indicated that irreparable harm is more easily found when the parties are direct

5   competitors in the same market.  See, e.g. id. at 1153-54.

6       Plaintiffs assert that the introduction of Defendants' GenStrips to the market poses an

7   "existential challenge" to the viability of Plaintiffs' business, and moreover, that Defendants will

8   not have the resources to pay any damages award ultimately incurred.  Dkt. No. 176 at 16.

9   Defendants intend to sell their GenStrips at one-half the price of Plaintiffs' strips, and Defendants

10  have projected $173.5 million in U.S. sales in the first full year.  Declaration of Peter Menziuso

11  ("Menziuso Decl.") ¶¶ 21, 22, Exs. R, S, U, Dkt. No. 176-3.  Given Defendants' pricing structure,

12  this projected sales figure does not accurately reflect the potential losses to Plaintiffs, which would

13  be far greater.  Menziuso Decl. ¶ 24.  Defendants' pricing structure would also cause price erosion

14  because Plaintiffs would likely need to cut the prices of their strips in order to compete, making it

15  extremely difficult to raise prices back to the earlier level if and when GenStrips are removed from

16  the market.  Id. at ¶ 36.[2]  Plaintiffs further contend that the sale of Defendants' GenStrips threatens

17  less concrete forms of harm.  Particularly, the sale of GenStrips stands to jeopardize Plaintiffs'

18  market share and its position as market leader (See Menziuso Decl. ¶ 7), poses a threat to

19  Plaintiffs' goodwill and reputation (Menziuso Decl. ¶¶ 28, 33, 36-39), and could lead to a reduction

20  in Plaintiffs' research and development budget (Menziuso Decl. ¶ 46).

21      Defendants do not seriously dispute any of the factual evidence submitted by Plaintiffs.

22  Rather, they contend that Plaintiffs cannot establish irreparable harm because they have not proven

23  a causal nexus between the infringement of the '105 patent and the harm Plaintiffs allegedly will

24  suffer.  Relying on the Federal Circuit's decision in Apple, Inc. v. Samsung Electronics Co., which

[2] In their Response to Supplemental Declarations Filed by Plaintiff In Support of Plaintiffs' Motion for a Preliminary Injunction (Dkt. No. 234), Defendants argue that the American Taxpayer Relief Act ("ATRA") has rendered Plaintiffs' price erosion argument irrelevant.  This brief does not change the court's analysis of irreparable harm as Plaintiff has demonstrated multiple forms of harm aside from price erosion.

26

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court<br>For the Northern District of California

held that irreparable harm is not proven "if consumers buy that product for reasons other than the patented feature," Defendants argue that it is Plaintiffs' distribution scheme, and not their technology, which drives demand. 695 F.3d 1314, 1374 ("<u>Apple II</u>"). The court is not persuaded by this argument. Unlike a smartphone, which contains a myriad of features, test strips designed for use in the OneTouch Ultra meter embody a substantial part of the patented feature and not much else. That Plaintiffs have become the market leader suggests that they possess a superior technology, the technology of the '105 patent.

Defendants further contend that even if a nexus between the infringement and the harm could be established, that Plaintiffs' lost sales and market share do not constitute irreparable harm. Defendants point to <u>Abbott Laboratories v. Andrx Pharmaceuticals, Inc.</u> for the proposition that lost sales alone are insufficient to demonstrate irreparable harm. 452 F.3d 1331, 1348 (Fed. Cir. 2006). However, Defendants' reliance on that case is inapposite. In <u>Abbot Labs.</u>, the patentee had failed to establish likelihood of success on the merits, was unable to quantify its lost sales or hardship, and did not "clearly establish[] that monetary damages could not suffice." <u>Id.</u>

The surrounding circumstances are quite different here. First, Plaintiffs do not rely on lost sales alone; Plaintiffs have pointed to multiple forms of harm they will likely experience in the absence of an injunction. Second, as discussed in the previous section, Plaintiffs have demonstrated a likelihood of success on the merits. Third, Plaintiffs have presented concrete evidence regarding their potential losses based on Defendants' own projections. Plaintiffs' argument is particularly compelling in this case because, given that the FDA has only approved GenStrips for use in Plaintiffs' OneTouch Ultra meter, the parties are faced with a zero-sum game in which every sale made by Defendants is likely a sale lost by Plaintiffs. Finally, Plaintiffs have sufficiently shown a likelihood of Defendants' inability to pay a damages award at the end of trial. Plaintiffs have presented evidence suggesting that Defendants have no income stream from anything other than the sale of GenStrips, and have minimal cash on hand. <u>See</u> Dkt. No. 137 at 11 (in which counsel for Shasta admits that Shasta has "no product and no income stream

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

1   whatsoever"); Menziuso Decl., Ex. V at F-6 (reflecting Instacare's[3] net loss of more than $2

2   million for fiscal year 2011); Menziuso Decl., Ex. W at 5 (confirming Instacare's net loss for the

3   nine months ending September 30, 2012 and reflecting net cash of only $7590).  While

4   Defendants' income streams certainly stand to strengthen dramatically now that GenStrips have

5   entered the market, the court agrees with Plaintiffs that it is unlikely Defendants will have the

6   ability to pay the full amount of monetary damages that could be awarded at trial.  Defendants'

7   pricing structure necessarily implies that Defendants' revenues will never equate to Plaintiffs'

8   losses.  Thus without revenues from other sources, it will be impossible for Defendants to satisfy a

9   judgment covering the entirety of Plaintiffs' damages.  The court therefore finds that Plaintiffs

10  have made a clear showing that they may be irreparably harmed in the absence of an injunction.

11              **2.4 Balance of Hardships**

12          Next the court must determine whether Plaintiffs have demonstrated that the balance of

13  hardships tips in their favor.  Defendants rely on the relative David and Goliath stature of the

14  parties to show that their hardship outstrips any hardship experienced by Plaintiffs.  While "[t]he

15  hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market

16  before trial can be devastating," the hardships may nonetheless weigh in favor of the patentee in

17  circumstances such as these.  Ill. Tool Works, Inc. v. Grip–Pak, Inc., 906 F.2d 679, 683 (Fed. Cir.

18  1990).  The balance tips towards the patentee because "one who elects to build a business on a

19  product found to infringe cannot be heard to complain if an injunction against a continuing

20  infringement destroys the business so elected."  Bosch, 659 F.3d at 1156 (quoting Windsurfing Int'l

21  Inc. v. AMF, Inc., 782 F.2d 995, 1002 n. 12 (Fed. Cir. 1986)).  The court recognizes that

22  Defendants are small companies who may not be able to bear the brunt of a preliminary injunction.

23  However, this lawsuit was filed more than eighteen months ago, on September 9, 2011, and

24  Defendants only received FDA approval and commenced sales of GenStrips, to the best of the

25  court's knowledge, in January 2013.  It would thus appear that Defendants have taken a "calculated

26  _____

27  [3] The court is aware that Instacare has changed its name to Decision Diagnostics Corp. ("DDC"), and that Exhibits V
    and W reflect DDC's financial data; however, as the parties have not filed any notice or stipulation regarding this name
    change, the court will continue to refer to this entity as Instacare.

28                                          28

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

risk" by launching GenStrips during the pendency of this litigation. See <u>Sanofi-Synthelabo v.</u> <u>Apotex, Inc.</u>, 470 F.3d 1368, 1382 (Fed. Cir. 2006). Should the court deny a preliminary injunction, it would in essence require Plaintiffs to "compete against their own patented invention" to their detriment. <u>Bosch</u>, 659 F.3d at 1156. Under these circumstances, where Plaintiffs have demonstrated a likelihood of success on the merits, such an outcome would be improper. Accordingly, this factor favors the entry of a preliminary injunction.

### 2.5 Public Interest

Finally, the court must consider whether an injunction weighs in the public interest. Defendants argue that the public interest must caution against an injunction, because removing GenStrips from the market would deny the public a low-cost alternative to Plaintiffs' product. Plaintiffs rely on the purposes of the patent laws to support an injunction. While Defendants' argument is certainly reasonable, the court agrees with Plaintiffs.

The "encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." <u>Patlex Corp. v. Mossinghoff</u>, 758 F.2d 594, 599 (Fed. Cir. 1985). The Federal Circuit has specifically recognized the importance of protecting patent rights in the medical field because the system "provides incentive to the innovative drug companies to continue costly development efforts." <u>Sanofi-Synthelabo</u>, 470 F.3d at 1383. Where, as here, the court has found that the patentee has demonstrated a likelihood of success on the question of infringement, "there can be no serious argument that public interest is not best served by enforcing [the patent]." <u>Abbott Labs. v. Sandoz, Inc.</u>, 544 F.3d 1341, 1362 (Fed. Cir. 2008). Thus, the court finds that the public interest weights slightly in favor of granting an injunction in this case.

### 2.6 Conclusion

For the foregoing reasons, the court GRANTS Plaintiffs' Motion for Preliminary Injunction. Defendants, along with their officers, directors, partners, agents, servants, employees, attorneys, subsidiaries, and those acting in concert with any of them are enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States,

Case No.: 5:11-CV-04494-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1   GenStrips.  As a condition of the preliminary injunction and pursuant to Federal Rule of Civil

2   Procedure 65(c), the court will require Plaintiffs to post security in an amount sufficient to secure

3   payment of any damages sustained by Defendants if they are later found to have been wrongfully

4   enjoined.  Therefore, Defendants shall submit evidence concerning the proper amount of bond

5   within <u>five</u> days of the date of this order.  Plaintiffs shall submit response evidence concerning the

6   proper amount of bond <u>five</u> days thereafter.  Neither party's brief shall exceed ten pages in length.

7   The court will not consider any further responses from the parties.  This Order shall be held in

8   abeyance until Plaintiffs' posting of the bond in the amount determined by the court.

9           The parties are further ORDERED to meet and confer and submit a joint status report

10   within thirty days from the date of this Order.  In the status report, the parties shall address (1) their

11   intentions regarding any appeal of this Order; (2) if appealed, whether the parties intend to seek a

12   stay of proceedings pending the appeal, and (3) the parties' positions regarding alternative dispute

13   resolution.

14   **3.  DEFENDANTS' MOTION TO DISMISS**

15           Defendants seek to dismiss Count Three of Plaintiffs' First Amended Complaint—

16   Declaratory Judgment for Indirect Infringement of the '105 Patent—on the same exhaustion and

17   Sherman Act grounds they have presented to contest Plaintiffs' Motion for Preliminary Injunction.

18   As discussed in Section 2.2.1, Plaintiffs have not only stated a claim on this count, but have

19   demonstrated a likelihood of success on it.  Accordingly, for the reasons set forth in Section 2.2.1,

20   Defendants' Motion to Dismiss is DENIED.

21   **IT IS SO ORDERED**

22   Dated: March 19, 2013

23   _____

24   EDWARD J. DAVILA
     United States District Judge

25

26

27

28                                          30